[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12464

Argument Calendar

_____

D.C. Docket No. 5:10-cv-00433-CAR

KEITH THARPE,

Petitioner - Appellant,

versus

WARDEN,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 25, 2016)

Before TJOFLAT, MARCUS, and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This is the latest iteration in a series of challenges brought by Keith Leroy Tharpe to the sentence of death he received in 1991 for kidnapping his wife and kidnapping and murdering Jaquelin Freeman, his sister-in-law. After decades of litigation and having exhausted his opportunities for relief on direct and collateral review in the Georgia courts, Tharpe now appeals the District Court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Our review is limited to the following two issues: First, whether Tharpe's trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Second, whether Tharpe is intellectually disabled and thus ineligible for the death penalty under the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). With the benefit of thorough briefing and oral argument, we conclude that Tharpe has failed to make either showing.

## I.

### A.

Twenty-six years ago, Tharpe murdered Jaquelin Freeman, his sister-in-law, by shooting her multiple times with a shotgun. The Georgia Supreme Court recounts the circumstances of the killing as follows:

> Tharpe's wife left him on August 28, 1990 and moved in with her mother. Following various threats of violence made by the defendant to and about his wife and her family, a peace warrant was taken out

2

against him, and the defendant was ordered not to have any contact with his wife or her family.  Notwithstanding this order, Tharpe called his wife on September 24, 1990 and argued with her, saying if she wanted to "play dirty," he would show her "what dirty was."

On the morning of the 25th, his wife and her sister-in-law met Tharpe as they drove to work.  He used his vehicle to block theirs and force them to stop.  He got out of his vehicle, armed with a shotgun and apparently under the influence of drugs, and ordered them out of their vehicle.  After telling the sister-in-law he was going to "f—— you up," he took her to the rear of his vehicle, where he shot her. He rolled her into a ditch, reloaded, and shot her again, killing her.[1]

Tharpe then drove away with his wife. After unsuccessfully trying to rent a motel room, Tharpe parked by the side of the road and raped his wife.  Afterward, he drove to Macon, where his wife was to obtain money from her credit union.  Instead she called the police.

*Tharpe v. State*, 416 S.E.2d 78, 79–80 (Ga. 1992).

Following a nine-day trial in Jones County, Georgia, lasting from January 2 to January 10, 1991, Tharpe was found guilty of malice murder and two counts of kidnapping with bodily injury.  At sentencing, as during the guilt–innocence stage of the trial, counsel presented to the jury an image of Tharpe as a good person who had been temporarily overcome with the emotional distress of being left by his wife.  Thirteen witnesses including Tharpe; his mother, Naomi Tharpe; his sister, Audrey Pope; his cousin, Laverne Shermer; his wife, Migrisus; two of his

---

[1] The wife could not remember if the sister-in-law had been shot twice or three times. However, the autopsy established that the victim had been shot three times—once in the arm, once in the chest and once in the head.

3

daughters; and some of his friends testified on Tharpe's behalf. These witnesses portrayed Tharpe as a good son, a good husband, a good father, a good student, and a good friend, and asked the jury to spare Tharpe's life. Although the State introduced some evidence of Tharpe's criminal history, the jury did not learn about other aspects of Tharpe's troubled past, including his difficult and abusive upbringing, his history of substance abuse, and his low intellectual functioning.

The jury voted unanimously to impose the death penalty. The jury found three statutory aggravating factors pursuant to O.C.G.A. § 17-10-30(b)(2) and (b)(7): the murder was committed while Tharpe was engaged in the commission of another capital felony, the kidnapping with bodily injury of the victim, Jaquelin Freeman; the murder was committed while Tharpe was engaged in the commission of another capital felony, the kidnapping with bodily injury of Tharpe's wife, Migrisus Tharpe; and the murder was outrageously or wantonly vile, horrible, or inhuman because it involved an aggravated battery to the victim. Tharpe moved for a new trial on January 19, 1991. The trial court denied his motion on August 15, 1991. On direct appeal, the Georgia Supreme Court affirmed Tharpe's conviction and death sentence on March 17, 1992. The United States Supreme Court denied certiorari on October 19, 1992. *Tharpe v. Georgia*, 506 U.S. 942, 113 S. Ct. 383 (Mem), 121 L. Ed. 2d 292 (1992).

4

On March 17, 1993, Tharpe filed his first petition for writ of habeas corpus in the Superior Court of Butts County, Georgia. Tharpe amended his habeas petition twice, first on December 31, 1997, and then again on January 21, 1998. The Superior Court held evidentiary hearings on May 28, 1998; August 24, 1998; October 1–2, 1998; December 11, 1998; December 23, 1998; and July 30, 2007. The Superior Court ultimately issued a 105-page order denying relief on December 1, 2008. The Georgia Supreme Court denied Tharpe's application for a certificate of probable cause to appeal the Superior Court's denial of habeas corpus on April 19, 2010. The United States Supreme Court denied certiorari on November 29, 2010. *Tharpe v. Upton*, 562 U.S. 1069, 131 S. Ct. 655 (Mem), 178 L. Ed. 2d 491 (2010).

On November 8, 2010, Tharpe filed his second petition for writ of habeas corpus, this time pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Georgia. After granting Tharpe's motions to appoint counsel and to proceed in forma pauperis, the District Court denied Tharpe's motions to conduct discovery and hold an evidentiary hearing. The Court then denied Tharpe's habeas petition on March 6, 2014, and Tharpe's motion to alter and amend judgment on May 8, 2014.

In its order of March 6, 2014, the District Court issued a Certificate of Appealability ("COA") on the following issue:

5

> Whether the state habeas court's determination that Tharpe's trial counsel was not ineffective in the investigation and presentation of mitigation evidence was based on an unreasonable determination of the facts, or was contrary to, or involved an unreasonable application of, clearly established federal law.

Tharpe subsequently moved this Court to expand the COA to encompass two other issues. We granted both requested extensions, the first on July 30, 2014, and the second on December 30, 2014:

> (1) Whether the Georgia court's decision that appellant is not exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002) is contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or … resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

> (2) Whether defense counsel rendered ineffective assistance of counsel in failing to present an intellectual disability defense at the guilt–innocence phase of his trial.[2]

Taking the issues before us on appeal together, Tharpe is requesting relief on a Sixth Amendment ineffective-assistance-of-counsel theory under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and an

---

[2] To the extent Tharpe is challenging trial counsel's conduct during the guilt–innocence phase of his trial, his argument to this effect is wholly subsumed by his *Strickland* and *Atkins* theories that (1) counsel performed a constitutionally inadequate investigation into Tharpe's mental-health status, (2) counsel unreasonably selected a good-character defense over a diminished-capacity defense, and (3) Tharpe is intellectually disabled and thus ineligible for the death penalty. Because we reject those theories, we likewise reject Tharpe's argument that his trial counsel failed to uncover or present an intellectual-disability defense during the guilt–innocence phase of his trial.

6

Eighth Amendment intellectual-disability theory[3] under *Atkins v. Virginia*, 536

U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

B.

Having laid out in broad strokes the procedural history of Tharpe's case, we

turn now to the state collateral proceedings in more detail. Judge Richard T.

Winegarden of the Superior Court of Butts County issued his order denying

Tharpe's requested relief more than a decade after Tharpe filed his state habeas

petition, during which time six separate evidentiary hearings were held. Judge

Winegarden rejected most of the forty-one claims Tharpe raised in his second

amended petition as barred by res judicata, procedurally defaulted, non-cognizable,

or moot. Of Tharpe's remaining claims that reached merits determinations,[4] we

will discuss only the relevant *Strickland* and *Atkins* findings and conclusions.

1.

As to Tharpe's *Strickland* ineffective-assistance-of-counsel claim, Judge

Winegarden concluded that Tharpe had "failed to carry his heavy burden" because

---

[3] Throughout this opinion we will use the term "intellectual disability" to refer to what was previously known as "mental retardation," in line with the Supreme Court's change in usage that in turn reflects a change adopted in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders ("the DSM-5") put out by the American Psychiatric Association. *See Hall v. Florida*, 572 U.S. __, __, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014).

[4] In addition to Tharpe's ineffective-assistance-of-counsel and intellectual-disability claims for relief, Judge Winegarden also denied on the merits Tharpe's claim of juror misconduct.

7

Tharpe could show neither the inadequacy of trial counsel's performance nor the attendant prejudice that *Strickland* requires. After laying out *Strickland*'s familiar two-prong test, Judge Winegarden began by assessing whether Tharpe's trial counsel performed as "some reasonable lawyer at the trial could have acted, in the circumstances," without violating the minimum guarantees of the Sixth Amendment. The following facts, drawn from the trial record and post-trial evidentiary hearings, informed that analysis.

At trial and on direct appeal, Tharpe had been represented by two veteran lawyers, Charles Newberry and Shane Geeter. At the time of Tharpe's trial, Newberry had previously served four years at the Ocmulgee District Attorney's Office, including three as Chief Assistant District Attorney; had tried between fifty and one hundred cases involving murder, robbery, rape, kidnapping, aggravated assault, battery and aggravated battery, theft, and forgery; and, following his time in the District Attorney's Office had been lead defense counsel in three capital trials, none of which led to the death penalty being imposed. Geeter had also worked in the District Attorney's Office, during which time he tried between seven and twelve criminal cases before a jury as well as more than one hundred fifty civil bench trials. In private practice, Geeter's caseload was 60 to 70 percent criminal work, which included murder cases. Both Newberry and Geeter had spent a majority of their professional lives working in the Ocmulgee Judicial Circuit,

8

which was where Tharpe was tried.  Both Newberry and Geeter had worked under

District Attorney Joe Briley, who prosecuted Tharpe's trial.

The trial judge appointed Newberry and Geeter as co-counsel to represent

Tharpe in the fall of 1990.  In preparation for trial, Newberry and Geeter consulted

with other attorneys, including defense attorneys in the Ocmulgee Judicial Circuit

who had experience with death-penalty cases, and reviewed several practitioner

resources for trying a capital case.[5]  Although "there was no official division of

duties" assigned between co-counsel, Newberry and Geeter unofficially divvied up

the responsibilities for investigating witnesses and filing motions.  Both Newberry

and Geeter, either together or individually, spoke with each witness at some point.

At the beginning of their investigation, Newberry and Geeter met with

District Attorney Briley, who discussed the State's trial strategy and allowed them

to review and copy his case file under Briley's "open file policy" for death-penalty

cases.  Newberry and Geeter also received a copy of the State's witness list and

were referred to investigators in the Sheriff's Office and the Georgia Bureau of

Investigation familiar with the murder of Jaquelin Freeman.  Newberry and Geeter

interviewed each of those investigators and everyone on the State's witness list.

---

[5] The resources that Newberry and Geeter reviewed included Stephen Bright's manual "Defending a Capital Case in Georgia," William Daniel's *Georgia Criminal Trial Practice*, and *Criminal Trial Practice*.

They also visited the crime scene twice and reviewed investigative and autopsy reports, photos, and physical evidence held by the District Attorney's Office and the Georgia Bureau of Investigation. As a result of their investigative efforts, Newberry and Geeter were able to challenge other lesser charges that the State was pursuing against Tharpe on the theory that Tharpe had been "over-indicted" under a "'shot gun approach.'" These efforts led to the State ultimately withdrawing an armed-robbery charge.[6]

In advance of trial, Newberry and Geeter attempted to reach a plea bargain with District Attorney Briley and moved the trial court to bar the State from seeking the death penalty. Newberry and Geeter met with Tharpe "numerous times" throughout their investigation, conferring with him about "every detail of the case." According to testimony elicited during one of the five evidentiary hearings, Newberry and Geeter had found Tharpe to be sufficiently capable to participate in his defense, including in making strategic decisions.

---

[6] Judge Winegarden also found, notwithstanding Tharpe's contrary assertions, that Newberry and Geeter had researched the kidnapping charges as to both Migrisus Tharpe and Jaquelin Freeman.

In part because Tharpe's account of the murder closely paralleled that of his wife, Migrisus Tharpe, the only living witness,[7] Newberry and Geeter decided that it would be best to have Tharpe remain silent during the guilt–innocence phase of the trial and testify only at the sentencing phase.  This decision was the result of a strategy focused on portraying Tharpe as a man overcome by emotion and passion, based on the rationale that the jury might thus be inclined to find Tharpe guilty of voluntary manslaughter instead of malice murder.  In line with this mitigation strategy, Newberry and Geeter decided to present Tharpe as a generally respectable and sympathetic figure who nevertheless made a mistake as a result of an emotionally charged domestic situation.  They concluded that their chosen approach to seek the jury's mercy was the best, perhaps only, tack available under the circumstances known to them at the time—a conclusion that Newberry and Geeter also defended with the benefit of hindsight.

Anticipating that the State would challenge this image of Tharpe's character, Newberry and Geeter conducted an investigation to assess the strength of various mitigation theories.  Meeting with family and friends whom Tharpe had referred them to, Newberry and Geeter were told that Tharpe was a "smart" and friendly

---

[7] Tharpe and his wife disagreed only as to whether Tharpe had shot his sister-in-law two or three times.  Contrary to his account, the autopsy report revealed that Tharpe had shot Jaquelin Freeman three times.

11

man who had been well-behaved during his childhood, a high-school graduate who had earned "good grades" and ran track, a good worker who would pick up available work jobs, and a husband who had maintained a marriage for eleven years. Newberry and Geeter also discovered that Tharpe had a criminal history including a conviction as a "habitual violator" for various traffic offenses that included driving under the influence, a history of substance abuse, and an unstable work history. Many of the potential witnesses Tharpe had identified were hesitant to testify on his behalf, with the exceptions of his mother and his aunt. Newberry and Geeter feared that if they did not proceed to trial quickly, the nature of Tharpe's crime would further diminish the potential witnesses' willingness to provide mitigating testimony; most notable in this regard was Migrisus Tharpe's willingness to testify. Neither Tharpe himself nor the witnesses he identified suggested to Newberry and Geeter during their investigation either that Tharpe had been abused or neglected in the past or that Tharpe's upbringing had been anything but positive. Based on their experience and judgment, Newberry and Geeter concluded that offering evidence of Tharpe's alcohol abuse and unstable work history would do more harm than good with the jury.

Newberry and Geeter also explored the possibility that Tharpe may have had a viable mental-health defense by investigating whether Tharpe had suffered from various mental-health disorders or sustained a serious head injury. To that end,

12

they had Tharpe evaluated by Dr. Archer Moore, a psychologist whom Newberry had previously retained as an expert witness in another murder trial. Dr. Moore evaluated Tharpe based on an interview and a battery of tests that were designed to identify Tharpe's general intellectual functioning and the possible existence of organic brain damage. Those tests included the Wechsler Adult Intelligence Scale Revised test ("the WAIS-R test"), the Bender Visual Motor Gestalt Test, the Rorshach test, and the House–Tree–Person test. Dr. Moore described Tharpe's score of 73[8] on the WAIS-R as indicating that Tharpe had "borderline intellectual functioning" but was "not mentally retarded."

The State had its own psychologist, Dr. Robert Storms, evaluate Tharpe. Dr. Storms likewise concluded that Tharpe "exhibited no signs of mental retardation" based on that evaluation, though Dr. Storms concluded that the results from the test he administered were invalid because they indicated Tharpe was malingering. Both Dr. Moore and Dr. Storms described Tharpe as "mean," with Dr. Moore going so far as to call Tharpe a "mean son of a bitch." Based on Dr. Moore's and Dr. Storms's conclusions and impressions concerning Tharpe, which may have proven aggravating rather than mitigating had they been presented to the jury, Newberry and Geeter decided to forgo a mental-health defense.

---

[8] Based on calculation errors on two subparts, Dr. Moore originally scored Tharpe's test as a 74 but later rescored Tharpe's test as a 73.

Considering Newberry and Geeter's investigation and mitigation efforts under the circumstances known to them at the time and in line with the great deference due trial counsel's informed strategic decisions under *Strickland*, Judge Winegarden concluded that Tharpe had failed to prove either ineffective performance or prejudice.

2.

As to Tharpe's *Atkins* intellectual-disability claim, Judge Winegarden concluded that Tharpe had failed to establish beyond a reasonable doubt that Tharpe was intellectually disabled and thus ineligible for the death penalty as a matter of Georgia law.  Judge Winegarden began by citing Georgia's three-part test for establishing intellectual disability.  That test, which was borrowed from the third edition of the Diagnostic and Statistical Manual of Mental Disorders ("the DSM III") put out by the American Psychiatric Association, defines intellectual disability[9] as the status of someone having (1) "significantly subaverage general intellectual function . . . [, which] is generally defined as an IQ of 70 or below," (2) that "result[s] in or [is] associated with impairments in adaptive behavior" and (3) "manifestation of this impairment during the developmental period."  *See*

---

[9] The Georgia Code, having adopted the usage of the DSM III, retains the term "mental retardation" in O.C.G.A. § 17-7-131(a)(3).  As noted above, we will use the term "intellectual disability" to describe that condition.

14

O.C.G.A. § 17-7-131(a)(3). What follows are Judge Winegarden's relevant factual findings and legal conclusions.

As discussed above, both Tharpe's own psychological expert and the State's, Dr. Moore and Dr. Storms, concluded before trial that Tharpe had borderline intellectual functioning but was not intellectually disabled. During the habeas proceedings, three other mental-health experts evaluated Tharpe: Dr. Marc Zimmerman and Dr. Barry Crown,[10] Tharpe's experts, and Dr. Glen King, the

---

[10] Dr. Crown's work in capital cases is not unfamiliar to this Court. Perhaps in part because of this familiarity, Tharpe relies more heavily on the testimony of Dr. Zimmerman than that of Dr. Crown. *See, e.g.*, *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 895 (11th Cir. 2013) ("Dr. Crown, a neuropsychologist, conducted a battery of tests on Reaves and concluded that he suffered from organic brain damage in a neural region associated with understanding the long-term consequences of immediate behavior. He did not know the origin, cause, or timing of the brain damage."); *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 472 (11th Cir. 2012) ("Crown added that he had evaluated Lawrence for competency at some point after Lawrence's arrest in May 1998, at least a year before the penalty phase was conducted in the instant murder trial. He concluded that Lawrence was not competent at that time either, but he acknowledged that two other psychologists, Dr. Bingham and Dr. Larson, had also evaluated Lawrence in October 1998 and both had found Lawrence to be competent."); *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1287 (11th Cir. 2012) ("Doctor[] Crown . . . conducted only limited research. Crown admitted that he had evaluated Ponticelli seven years after the murders and that he had never been qualified as an expert in neurology in any court of law. He testified that his opinion was based entirely on neuropsychological tests that he had conducted on Ponticelli and that he had not considered other materials or testimony, including testimony about how Ponticelli appeared to exercise executive type reasoning on the night of the murders."); *Suggs v. McNeil*, 609 F.3d 1218, 1230 (11th Cir. 2010) (noting, in reference to Dr. Crown, that "a reasonable jury is likely to have been highly skeptical of a penalty-phase expert who, according to his own testimony, testifies 'in many' habeas proceedings and 'usually . . . on behalf of the defense' and who would have testified for Suggs about intellectual 'efficiency.'" (alteration in original)); *Pace v. McNeil*, 556 F.3d 1211, 1217, 1224 n.22 (11th Cir. 2009) ("Dr. Crown testified that Pace was of average intelligence but his 'intellectual efficiency' was significantly diminished such that he had the problem-solving abilities of a thirteen-year old child. Dr. Crown added that drug addiction increased the likelihood that a person with Pace's intellectual capabilities would engage

15

State's expert.  Dr. Zimmerman in 1998 and Dr. King in 2007 each administered to Tharpe a WAIS-III test that yielded a score below 70 (a score of 66 and 67 respectively).  Given the conflicting scores of the pre- and post-trial testing and because a sub-70 score on an I.Q. test does not alone entail a finding of intellectual disability under Georgia law, Judge Winegarden moved on to the other two requirements for establishing intellectual disability:  impairment in adaptive behavior and the time at which any such impairment manifested.

Turning to Tharpe's adaptive behavior—how well Tharpe was able to meet common demands of daily life and how well Tharpe was able to meet the expectations of personal independence for a person in like circumstances—Judge Winegarden looked to the following categories of adaptive behavior identified by the American Association on Intellectual and Development Disabilities[11]: (1) communication, (2) self-care, (3) home living, (4) social skills, (5) community use, (6) self-direction, (7) health and safety, (8) functional academics, (9) leisure, and (10) work.  Dr. Zimmerman, Tharpe's expert, found significant deficiencies in five categories, home living, social skills, functional academics, self-direction, and

in antisocial behavior. . . .  We agree as well with the [Florida] [S]upreme [C]ourt that the testimony of . . . Dr. Crown was unconvincing.").

[11] At the time Judge Winegarden was writing, the American Association on Intellectual and Development Disabilities was known as the American Association on Mental Retardation.

16

work, and therefore concluded that Tharpe was intellectually disabled; Dr. King, the State's expert, found that Tharpe did not have significant deficiencies in any category, and thus concluded that Tharpe was not intellectually disabled.

Tharpe challenged Dr. King's conclusion that Tharpe is not intellectually disabled on several grounds. Judge Winegarden considered and rejected the argument that the test on which Dr. King was relying, the ABAS-II, is inappropriate for evaluating subjects who are incarcerated because, in the ABAS-II manual, there is explicit recognition that the test is appropriate for use in prisons. Judge Winegarden also considered and rejected arguments that Dr. King's assessment was unreliable because Tharpe may have been lying in his responses to "look good" by adopting a "cloak of competence" and that Dr. King's assessment was unreasonable because it relied solely on the ABAS-II. Dr. King testified that during the interview portion of the ABAS-II Tharpe admitted on numerous occasions that he was unable or unlikely to engage in certain behavior and that Tharpe appeared responsive and varied his answers throughout. In addition to the ABAS-II, Judge Winegarden found that Dr. King had arrived at his conclusion by

17

reviewing other aspects of Tharpe's historical data, including his medical records, school records, police records, and information contained in affidavits.[12]

Judge Winegarden identified several inconsistencies in Dr. Zimmerman's conclusions about the deficiencies in Tharpe's adaptive behavior. As to home living, Judge Winegarden found that—contrary to Dr. Zimmerman's conclusion that Tharpe could act only "upon direction"—testimony from Tharpe and his friends and family established that Tharpe was, at least at times, independently able to cook, clean, operate small appliances, perform assorted household chores, take care of his children, make minor automotive repairs, write checks, deliver payments, shop for groceries, pass a driver's test, follow directions, and obey the rules and standards required of prisoners in Georgia.

As to social skills, Judge Winegarden rejected as unsupported Dr. Zimmerman's conclusion that Tharpe's "largely incoherent" comments in conferences with the trial court demonstrated a significant deficiency in communication because Dr. Zimmerman admitted that he had not been present at those conferences, that he had not spoken to trial counsel about those conferences, and that the trial judge would likely have noticed if Tharpe's comments were

---

[12] In contrast to the range of materials relied on by Dr. King, Judge Winegarden found that Dr. Zimmerman's conclusion relied in large part on information relayed in affidavits from Tharpe's friends and family, which contradicted many of the affiants earlier statements at sentencing and were found to be of dubious value.

incoherent (while there is no indication in the record that the judge noticed anything off about Tharpe's comments). Moreover, Judge Winegarden found that Tharpe reported being able to negotiate television-viewing schedules with his fellow inmates, maintaining a stable group of friends, consciously refraining from saying things that might hurt or embarrass others, and apologizing to others when he hurts their feelings. Family and friends testified that Tharpe has a "good heart" and was a "good friend"; he would help people if he saw their cars broken down on the side of the road; he would make friends with whom to fish and play cards; on occasion, he would bring fish he caught to an elderly friend; he remained married for eleven years; he would clean the house for his wife or take her out to dinners, movies, and parties; and he would buy his family Christmas presents and reward his children for good behavior.

As to functional academics, Dr. Zimmerman concluded that Tharpe's low I.Q. scores, low grades, and four instances of being "socially promoted"[13] from one grade level to another demonstrate a significant deficiency of adaptive behavior. Judge Winegarden observed that the measure of an individual's competency in functional academics, which refer to the basic reading and mathematics skills

---

[13] In the educational context, "social promotion" refers to "the promotion of a pupil to a more advanced class based on his or her age or behaviour, despite a lack of appropriate academic achievement." *Social Promotion*, Oxford English Dictionary (2016).

needed for everyday life, cannot be captured by school records alone. Judge Winegarden further indicated that Tharpe's school records and the testimony about Tharpe's formal academic performance were too vague and imprecise to be of much use. Tharpe's school records are silent, for example, about why he had been "socially promoted," and Tharpe offered only the affidavit of a former teacher who wrote that it was meant to "keep him with kids his own age." Tharpe's presence in classes labelled "fundamental," which may or may not have designated the lowest track offered, and affidavits from family and friends describing Tharpe as "slow" were similarly unilluminating. In light of contrary evidence showing that Tharpe was able to stick with his education for twelve years and graduate from high school, even if he struggled to do so, and that he can perform everyday skills like writing letters to his children and pen pals, reading time on a clock, correctly calculating the amount of money needed to make a purchase, and accurately keeping score when playing games, Judge Winegarden concluded that Tharpe displayed adequate adaptive behavior in functional academics.

As to self-direction, Dr. Zimmerman concluded that Tharpe displayed a significant deficiency in this adaptive behavior largely because Tharpe exhibited behavior after he shot and killed Jaquelin Freeman suggestive of an excessive reliance on his wife. Specifically, according to Dr. Zimmerman, Tharpe relied on Migrisus Tharpe for driving directions and advice in dealing with the police after

20

the killing.  Judge Winegarden, in contrast, concluded that these aspects of Tharpe's behavior after the killing were taken "out of context" and, when the surrounding events are taken together, Tharpe's actions actually demonstrate a great deal of self-direction:  Tharpe relayed his plans to see his wife and made arrangements to borrow the truck used in the commission of his crimes on the night before; Tharpe brought a loaded rifle and arrived at the specific point on his wife's route to work at the specific time she would be there; and, when trying to secure a motel room in which to sexually assault his wife, Tharpe had the foresight to advise Migrisus that they would need to keep two dollars as gas money for their return trip.  Judge Winegarden noted that Dr. Zimmerman's analysis of Tharpe's purportedly excessive reliance on his wife failed to fully account for Tharpe's substance abuse and further found that other shortcomings, like Tharpe's general lack of budgeting habits and unwillingness to pay bills unless prompted, were not because Tharpe "could not do things without direction, but that he sometimes acted selfishly when it came to money and look[ing] out for his own desires."  Combined with evidence of his ability to function independently recounted above (including his ability to cook, clean, travel, shop for groceries, care for his children, and engage in simple commercial transactions), Tharpe's ability to secure his own employment on multiple occasions precluded a showing of a significant deficiency in self-direction.

21

Finally, as to work, Judge Winegarden rejected Dr. Zimmerman's conclusion that Tharpe's checkered history of low-skilled and short-term employment demonstrated significant deficiency.[14]  Judge Winegarden explained that Dr. Zimmerman had once again overlooked Tharpe's substance abuse as a potential cause for Tharpe's inconsistent work history, as well as other possible explanations such as Tharpe's low intellectual abilities, his correspondingly limited set of marketable skills, and the inherently unstable schedule of working in construction and similar fields based on availability.  Judge Winegarden found no evidence in Tharpe's employment history that Tharpe had ever been fired for his inability to perform the work required of him.[15]

Accordingly, because there was not sufficient evidence of significant deficiencies in Tharpe's adaptive behavior and because there was no evidence in the record suggesting significantly sub-average intellectual functioning prior to age 18, Judge Winegarden concluded that Tharpe had failed to carry his burden to

---

[14] In response to Dr. Zimmerman's statement that "if I had an I.Q. score of 70 or below one of the things I would look at is the person the kind of person that somebody comes and picks them up and they cut grass, or are they the person that's running the business," Judge Winegarden speculated that, "Perhaps Dr. Zimmerman presumes that anyone who works doing manual labor, but does not run their own business, is mentally retarded."

[15] Judge Winegarden did find, however, that Tharpe had been fired from various positions for non-performance-related reasons including Tharpe's termination from a truck center after he was picked up by the police and failed to either contact the truck center or ever return to work.  Moreover, as trial counsel's notes reveal, one of Tharpe's former supervisors had reported that Tharpe displayed issues with rage and had brought firearms to the workplace.

show that he is intellectually disabled even though "intellectual testing, alone, places [Tharpe] in the sub-average range of intellectual functioning as required for a finding of" intellectual disability.

## C.

After the Supreme Court of Georgia denied Tharpe a certificate of probable cause[16] and the Supreme Court of the United States declined to grant certiorari, Tharpe next petitioned the District Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which he later amended. The District Court denied Tharpe's § 2254 petition. The District Court began its order denying relief by recounting the factual underpinnings of Tharpe's *Strickland* and *Atkins* claims[17] and laying out the deferential standard of review owed by federal courts to the decisions of state courts on collateral review. The District Court then rejected Tharpe's claims as follows.

## 1.

The District Court held that Judge Winegarden's order denying Tharpe's *Strickland* ineffective-assistance-of-counsel claim was neither contrary to nor an

---

[16] The Georgia Supreme Court denied Tharpe a certificate of probable cause over the dissent of then–Chief Justice Hunstein. Justice Thompson took no part in that decision.

[17] Although Tharpe purported to claim in his briefing before the District Court that he was not abandoning various other claims for relief, the District Court summarily denied relief on all other grounds because Tharpe had failed to address those claims in detail and, in any event, had failed to carry his burden of showing that the state courts' adjudications on those claims warrant reversal under the deference required by § 2254.

unreasonable application of clearly established federal law and did not involve an unreasonable determination of the facts.  The District Court rejected, as foreclosed by precedent, Tharpe's preliminary argument that Judge Winegarden had almost verbatim, and thus improperly, relied on the State's proposed order in issuing his own order.  *See Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S. Ct. 1504, 1510–11, 84 L. Ed. 2d 518 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties,–. . . . Nonetheless, our previous discussions of the subject suggest that even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."); *Rhode v. Hall*, 582 F.3d 1273, 1281–82 (11th Cir. 2009) (per curiam) (rejecting the argument that a state court's habeas order adopting the State's proposed order "verbatim" in a capital case is not entitled to deference under § 2254).  Likewise, the District Court rejected Tharpe's argument that Judge Winegarden's order was unreasonable because it failed to cite any post-*Strickland* precedent from the Supreme Court of the United States.  *See Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S. Ct. 1495, 1511–12, 146 L. Ed. 2d 389 (2000) (noting that "[i]t is past question" that *Strickland* itself, rather than subsequent applications of *Strickland*, provide the governing standard).

Turning to the heart of Tharpe's *Strickland* claim, the District Court held that it was not unreasonable or contrary to clearly established federal law for Judge

24

Winegarden to afford a greater, though not absolute, presumption of effective assistance because Newberry and Geeter were experienced counsel and their strategic decisions are accordingly due greater weight. *See Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc) ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."). The District Court also rejected Tharpe's argument that it was unreasonable for Judge Winegarden to conclude that Newberry and Geeter had conducted a reasonable investigation when Tharpe's mental health had not been evaluated by Dr. Moore prior to jury selection. The District Court held that Judge Winegarden's conclusion was not unreasonable because Newberry and Geeter had begun other aspects of their mitigation investigation prior to jury selection, had received Dr. Storms's evaluation that Tharpe was not intellectually disabled and had been malingering prior to trial, and had decided to proceed to trial quickly to ensure that Migrisus Tharpe and other witnesses would still be willing to testify on Tharpe's behalf.

The District Court also considered and rejected a host of cases that, according to Tharpe, dictate the outcome of the required *Strickland* analysis into Newberry and Geeter's mitigation efforts during their investigation and at trial: *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010) (per curiam), *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398

25

(2009) (per curiam), *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011), *Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008), and *Fleming v. Zant*, 386 S.E.2d 339 (Ga. 1989).  The District Court found each of these cases to be factually and legally distinguishable from Tharpe's, if not completely irrelevant.  Unlike the cases listed above, in which counsel performed an unreasonably limited investigation by ignoring certain "red flags" about a habeas petitioner's upbringing or mental-health status, the District Court observed that the record before it showed that Newberry and Geeter undertook a meaningful investigation and thereafter developed a mitigation strategy in line with what they discovered; neither Tharpe nor the friends and family to whom Newberry and Geeter were referred by Tharpe suggested that Tharpe had had a troubled or deprived background, and the evidence that was later elicited to this end during evidentiary hearings on state collateral review consisted largely of testimony from witnesses that contradicted those same witnesses' testimony at sentencing.  The District Court also held that the record showed, contrary to Tharpe's position, that Newberry and Geeter engaged in a "cost benefit analysis" of all the evidence available to them at the time before deciding to portray Tharpe as an otherwise good man who succumbed to his emotions in

26

shooting Jaquelin Freeman—a strategic choice whose force may have been undercut had Newberry and Geeter simultaneously tried to diminish Tharpe's culpability by introducing his substance abuse, his low intellectual functioning, and his unstable work history.

As a result, the District Court concluded that Judge Winegarden's denial of Tharpe's *Strickland* claim was not contrary to, or an unreasonable application of, clearly established federal law.

2.

The District Court likewise held that Judge Winegarden's order denying Tharpe's *Atkins* intellectual-disability claim was neither contrary to nor an unreasonable application of clearly established federal law and did not involve an unreasonable determination of the facts.  The District Court, noting Dr. Zimmerman's and Dr. King's dueling conclusions about Tharpe's adaptive behavior, held that Judge Winegarden's factual determinations concerning Tharpe's adaptive behavior were not unreasonable in light of the record.[18] Significant to the District Court's analysis, Georgia's standard for establishing

---

[18] The District Court, giving his order the "benefit of the doubt" required by § 2254's deferential standard, concluded that Judge Winegarden had not, as Tharpe contended, understood Georgia's law governing intellectual disability to require a diagnosis before age 18.  Rather, the District Court read the order as stating only that the lack of such a diagnosis was "compelling evidence" that Tharpe had not shown impairment manifested during the developmental period. In any event, the "real dispute among the experts" was whether Tharpe could demonstrate significant deficiencies in adaptive behavior.

intellectual disability in the death-penalty context required Tharpe to prove that he was intellectually disabled, including that he suffered significant deficiencies in adaptive behavior, beyond a reasonable doubt. *See* O.C.G.A. § 17-7-131(c)(3). Although Tharpe contended that Georgia's intellectual-disability standard is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution, contrary precedent from the Georgia Supreme Court and the Eleventh Circuit bound the District Court. *See Hill v. Humphrey*, 662 F.3d 1335, 1360–61 (11th Cir. 2011) (en banc); *Stripling v. State*, 711 S.E.2d 665, 668 (Ga. 2011) (citing *Head v. Hill*, 587 S.E.2d 613 (Ga. 2003)).

The District Court thus denied Tharpe's *Atkins* claim as well. At the end of its order denying Tharpe's § 2254 petition, the District Court issued a COA capturing part of Tharpe's *Strickland* ineffective-assistance-of-counsel claim. As mentioned above, this Court later granted Tharpe's request to amend the COA to expand the scope of Tharpe's *Strickland* claim and include his *Atkins* intellectual-disability claim as well.

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"),[19] federal courts reviewing habeas petitions from persons in state

custody pursuant to 28 U.S.C. § 2254 can grant relief only if the state court's

adjudication on the merits[20] "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States" or "was based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d).[21]  With this standard in mind, we

---

[19] AEDPA governs review for habeas petitions seeking relief in federal court that are filed after April 24, 1996.  As mentioned above, Tharpe filed his § 2254 petition on November 8, 2010.

[20] As we have recently held, the adjudication on the merits we are reviewing in cases like Tharpe's is the Georgia Supreme Court's denial of a certificate of probable cause.  *See Wilson v. Warden*, __ F.3d __, 2016 WL 4440381 (11th Cir. Aug. 23, 2016).  Our analysis does not change whether we analyze the decision of the Superior Court of Butts County or that of the Georgia Supreme Court because we must affirm if there is any reasonable basis for doing so and Judge Winegarden provided such a reasonable basis.  *See Harrington v. Richter*, 562 U.S. 86, 98, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden [under § 2254(d)] still must be met by showing there was no reasonable basis for the state court to deny relief.").  For simplicity and clarity we will therefore discuss only the reasoning given by Judge Winegarden, even though we are actually reviewing the decision of the Georgia Supreme Court.

[21] In its entirety, 28 U.S.C. § 2254(d) provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

29

review de novo a district court's denial of relief of a § 2254 petition, as we do a district court's legal conclusions and resolutions of mixed questions of law and fact. *Jones v. GDCP Warden*, 753 F.3d 1171, 1181 (11th Cir. 2014). We review for clear error a district court's findings of facts. *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1256 (11th Cir. 2012). In circumstances like those we face here—that is, when reviewing a district court's denial of a § 2254 petition that did not involve any factual findings beyond those of the relevant state court—a federal court of appeals is in the same position of reviewing the contested state-court adjudication as was the district court.

Under § 2254(d), AEDPA provides for limited federal review of state courts' decisions in two respects. First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal

30

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." *See Burt v. Titlow*, 571 U.S. __, __, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013); *accord Brumfield v. Cain*, 576 U.S. __, __, 135 S. Ct. 2269, 2282, 192 L. Ed. 2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at __, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010)).

The significant deference under § 2254(d) owed by the federal courts to state courts' decisions is rooted in AEDPA's commitment to comity, federalism, and the finality of judgments. Because "state courts are the principal forum for asserting constitutional challenges to state convictions," § 2254(d)'s standard of review

31

"stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102–03, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011).  Federal courts may grant habeas relief only when a state court blundered in a manner so "well understood and comprehended in existing law" and "was so lacking in justification" that "there is no possibility fairminded jurists could disagree." *Id.* at 102–03, 131 S. Ct. at 786–87.  A petitioner must show that the state court's decision was "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. __, __, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (quotation marks omitted).  "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S at 102, 131 S. Ct. at 786.

III.

A.

Tharpe's first theory of relief is that trial counsel deprived him of the Sixth Amendment's guarantee of effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),[22] and that Judge Winegarden's legal conclusions and factual determinations to the contrary

---

[22] The Sixth Amendment's right to counsel in capital cases has been incorporated against the States through the Due Process Clause of the Fourteenth Amendment for nearly a century. *See Powell v. Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L. Ed. 158 (1932).

warrant reversal even when viewed through § 2254(d)'s deferential lens.  Under *Strickland*'s familiar two-part test, Tharpe must show that counsel's performance (1) "fell below an objective standard of reasonableness" and (2) "prejudiced the defense."  466 U.S. at 687–88, 104 S. Ct. at 2064.  Considering "the variety of circumstances faced by defense counsel" and "the range of legitimate decisions regarding how best to represent a criminal defendant," review of counsel's effectiveness is "highly deferential" to respect "the wide latitude counsel must have in making tactical decisions."  *Id.* at 689, 104 S. Ct. at 2065.  "[A]ll the circumstances" must be viewed "from counsel's perspective at the time" because it is "all too easy" for a court "to second-guess" counsel's decisions after an outcome unfavorable to the defendant.  *Id.* at 688–89, 104 S. Ct. at 2065.  In order to establish prejudice casting doubt on the reliability of the result and thus the constitutionally assured fairness of the trial, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694, 104 S. Ct. at 2068.  A "reasonable probability" requires that "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112, 131 S. Ct. at 792.

When a habeas petitioner in state custody raises a *Strickland* claim in federal court, the commands of *Strickland* and § 2254(d) operate in tandem so that our review is "doubly deferential."  *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S. Ct. 1,

4, 157 L. Ed. 2d 1 (2003) (per curiam).  In these cases, a federal court may grant relief only if counsel's representation fell below *Strickland*'s highly deferential standard of objectively reasonable performance *and* the state court's contrary decision would be untenable to any fairminded jurist under § 2254(d)'s similarly difficult-to-meet standard.  Overcoming this double deference is therefore possible only in the rare instance when it is overwhelmingly certain that both counsel and the state court failed to carry out their respective roles with the requisite degree of competence.

Tharpe identifies two aspects of trial counsel's performance that he believes warrant relief.  First, Tharpe faults his trial counsel for failing to conduct an adequate investigation into his mental-health status, his history of substance abuse, and the circumstances of his upbringing.   Second, Tharpe argues that his trial counsel were ineffective because, whether or not counsel's investigation was adequate, counsel's presentation of the available mitigating evidence during the penalty phase of Tharpe's trial was deficient.  Because we conclude that Tharpe has failed to show that Judge Winegarden's conclusion that trial counsel's performance constituted anything but effective assistance under *Strickland* was contrary to, or an unreasonable application of, clearly established law and because that conclusion was not based upon unreasonable factual determinations, we do not

reach whether, had counsel been ineffective, Tharpe would be able to make the

additional required showing of prejudice.[23]

1.

Tharpe first challenges Judge Winegarden's legal conclusions and factual

determinations regarding the adequacy of trial counsel's investigation into his

mental-health status, substance abuse, and upbringing.  Specifically, Tharpe

contests the conclusion that trial counsel's performance was not objectively

unreasonable because they made only a "cursory and superficial background

investigation," relied on their "ignorance of the law" in their search for mitigating

evidence, and ignored "critical 'red flags' pointing to life-long mental impairments

and other problems."  Based on the available evidence, the court erred by finding

that Tharpe's "intellectual functioning was never in doubt" and he "was a well-

adjusted member of society portraying no symptoms of intellectual disability or

other mental problems."  Had trial counsel conducted a meaningful investigation,

Tharpe maintains, they would have discovered that Tharpe had been "raised in a

---

[23] Because we hold that Tharpe has failed to carry his burden as to *Strickland*'s performance prong, we need not reach Tharpe's argument that Judge Winegarden misstated or misapplied *Strickland*'s prejudice prong in the sentencing context. *Cf. Wiggins v. Smith*, 539 U.S. 510, 537, 123 S. Ct. 2527, 2543, 156 L. Ed. 2d 471 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is reasonable probability that at least one juror would have struck a different balance.").

35

'shot house' among alcoholics by his violently abusive mother"[24]; that Tharpe "suffers from significant cognitive and intellectual deficits as well as organic brain damage," which "likely resulted from Mr. Tharpe's exposure to brain damaging intoxicants *in utero*"; that Tharpe began drinking at an early age, getting drunk to the point of passing out by the time he was ten years old; and that Tharpe performed poorly academically and socially as a result. Trial counsel's allegedly inadequate investigation thus fell below the Sixth Amendment's performance standard under *Strickland*.

We disagree. Based on the factual record—which we see no reason, and certainly no reason sufficient under § 2254's deferential lens, to upset—a fairminded jurist could easily have concluded that Newberry and Geeter's investigation into Tharpe's background constituted reasonable assistance of counsel under the circumstances known to Newberry and Geeter at the time. Newberry and Geeter each met with prosecutors, law-enforcement officials, former employers, and friends and family who knew Tharpe, as well as meeting multiple times with Tharpe himself. Through these interviews, Newberry and Geeter were made aware of aspects of Tharpe's history of substance abuse, which included a conviction for violating Georgia's habitual traffic violator law, and his unstable

---

[24] "Shot house" is a slang term for an illicit bar where liquor is sold at low prices, often by the shot.

36

work history. As Judge Winegarden found, which was not an unreasonable factual determination, Newberry and Geeter had not been made aware of, nor had they been given any reason to suspect, the troubling account of Tharpe's childhood now presented as justifying relief—despite their having interviewed many of the witnesses, including Tharpe and those close to him, who provided testimony at sentencing that is now contradicted by those same witnesses' testimony on state collateral review. *See, e.g.*, *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.").

Moreover, Tharpe was evaluated by two mental-health experts during the investigation: Dr. Storms, the State's expert, and Dr. Moore, the expert retained by Newberry and Geeter. Neither Dr. Storms nor Dr. Moore concluded that Tharpe was intellectually disabled, only that Tharpe had borderline intellectual functioning. They also referred to Tharpe variously as "mean" and "a mean son of a bitch." It is true that Dr. Moore made his evaluation of Tharpe only after jury selection had begun. But having Dr. Moore's evaluation take place relatively late in the investigation was itself a function of Newberry and Geeter's strategic choice to proceed to trial in an expedited fashion to avoid the loss of mitigation witnesses' testimony, most notably that of Migrisus Tharpe, the only other witness to the murder of Jaquelin Freeman and herself a victim of Tharpe's crimes. And it is

37

these sort of in-the-trenches strategic decisions that are precisely "the sort of calculated risk that lies at the heart of an advocate's discretion." *Gentry*, 540 U.S. at 9, 124 S. Ct. at 6.  Taking all this together, Judge Winegarden did not unreasonably conclude that Newberry and Geeter's investigation satisfied the standard of adequate counsel in line with *Strickland* demanded by the Sixth Amendment.

None of the cases cited by Tharpe in his briefing to this court,[25] which are specific applications of *Strickland* to materially different factual circumstances, are to the contrary.  Tharpe cites *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), and *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), for the proposition that Newberry and Geeter, by failing to uncover the full circumstances of Tharpe's upbringing later adduced on state

---

[25] Nor do the cases supplied by Tharpe as supplemental authority show that Judge Winegarden's conclusions were unreasonable.  In *Hardwick v. Secretary, Florida Department of Corrections*, we held that there had been a showing of ineffective assistance under *Strickland* regarding counsel's investigation in a capital case when counsel "was aware of a number of red flags" concerning his client's life circumstances yet "did not conduct a life-history investigation or follow up on any leads" or attempt to undertake "even a rudimentary mitigation investigation."  803 F.3d 541, 552–54 (11th Cir. 2015).  Similarly, in *Cooper v. Secretary, Department of Corrections*, we held counsel's investigation to be ineffective under *Strickland* in a capital case when counsel "unreasonably decided to end the background investigation after only talking to" the defendant, the defendant's mother, and one mental-health expert, and when counsel was aware that the defendant had been violently abused by his father yet counsel failed to contact the defendant's siblings or otherwise engage in further investigative efforts.  646 F.3d 1328, 1351–52 (11th Cir. 2011).  Because Newberry and Geeter's investigative efforts were far more capable than, and materially different from, those of counsel in *Hardwick* and *Cooper*, those cases are relevant here only so far as they help frame the *Strickland* inquiry generally.

38

collateral review, had ignored certain "red flags" in their investigation.  Neither

*Rompilla* nor *Wiggins*, however, support Tharpe's assertion.

As Justice Souter reminds us in the beginning of his decision for the court in

*Rompilla*, the reasonableness standard of *Strickland*'s performance prong is

analyzed "as if one stood in counsel's shoes" and accordingly "spawns few hard-

edged rules."  545 U.S. at 381, 125 S. Ct. at 2462.  Depending on the

circumstances, counsel may fail to make an adequate mitigation investigation

either by conducting no meaningful investigation at all or by unreasonably failing

to follow up on certain leads despite conducting an otherwise-reasonable

investigation.  Thus, counsel in *Rompilla* were held to have conducted an

inadequate investigation despite having interviewed the defendant, five members

of the defendant's family, and three mental-health experts because counsel failed

to examine the defendant's prior conviction for rape and assault, a "readily

available" public document located "at the very courthouse where" the defendant's

trial would be held.  *See id.* at 381–84, 125 S. Ct. at 2462–64.  Counsel's failure to

investigate the defendant's prior conviction was unreasonable because that

conviction could serve as an "aggravator" under Pennsylvania's death-penalty law

*and* counsel knew, as evidenced in a "plea letter" written by counsel, that

prosecutors planned to seek the death penalty on the basis of that conviction.  *Id.* at

383–84, 125 S. Ct. at 2464; *see also id.* at 390, 125 S. Ct. at 2467 ("Other

39

situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment."). Notably, the *Rompilla* Court did not address whether other asserted failings of counsel—the failure to investigate the defendant's school records, criminal history as a juvenile, and history of substance abuse when the testimony of the witnesses' interviewed by counsel may have required further investigation—except to say "that there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry." *Id.* at 383, 125 S. Ct. at 2463; *see also id.* at 395, 125 S. Ct. at 2470 (O'Connor, J., concurring) (highlighting that counsel's failure to investigate the defendant's prior conviction "was not the result of an informed tactical decision about how the lawyers' time would best be spent"). Given the obvious and material differences between the dispositive facts of *Rompilla* and those present here, *Rompilla* is not controlling of Tharpe's case.

Tharpe's reliance on *Wiggins* is similarly misplaced. In *Wiggins*, the Supreme Court held that defense counsel's investigation into the violent and sexual abuse inflicted upon the defendant during childhood fell below the objective standard of reasonableness required by the Sixth Amendment. Counsel's investigation "drew from three sources": the report of a psychologist who conducted a battery of tests on the defendant, the defendant's presentence

40

investigation report, and the defendant's foster-care records from the Baltimore

City Department of Social Services. *Wiggins*, 539 U.S. at 523, 123 S. Ct. at 2536.

Despite evidence in those records showing the defendant's deprived and troubled

upbringing (though not the defendant's sexual abuse), counsel did not retain a

forensic social worker to create a social-history report, which was standard among

capital practitioners in Maryland at the time, despite having funds available to do

so, and conducted no further investigation. *See id.* at 523–25, 123 S. Ct. at 2536–

37. The record revealed that counsel's "failure to investigate thoroughly resulted

from inattention, not reasoned strategic judgment" because, "until the day before

sentencing," counsel maintained that they would be putting on a mitigation defense

if the trial court granted counsel's motion to bifurcate the penalty phase.[26] *Id.* at

526, 123 S. Ct. at 2537–38. Because "strategic choices made after less than

complete investigation are reasonable precisely to the extent that reasonable

professional judgments support the limitations on investigation," counsel's failure

to fully apprise themselves of potentially mitigating aspects of the defendant's life

---

[26] Wiggins elected to be tried by a judge during the guilt-innocence phase of his trial. *Wiggins*, 539 U.S. at 514–15, 123 S. Ct. at 2532. Counsel's main trial strategy in *Wiggins* at the penalty phase, which was conducted before a jury, was to argue to the jury that someone other than the defendant was principally responsible for the crime that the judge had found the defendant guilty of committing; after the trial court denied the motion to bifurcate proceedings, counsel declined to present a serious case for mitigation. *See Wiggins*, 539 U.S. at 515–16, 526, 123 S. Ct. at 2532, 2538 (observing that "counsel put on a halfhearted mitigation case, taking . . . [a] 'shotgun' approach").

history was unreasonable in the face of such obvious indications. *Id.* at 527–28, 123 S. Ct. 2538–39 (quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066). The *Wiggins* Court ended its analysis of *Strickland*'s performance prong by "emphasiz[ing] that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533, 123 S. Ct. at 2541. As with *Rompilla*, the obvious and material differences between *Wiggins* and Tharpe's case preclude *Wiggins* from being controlling here.

Nor does the rationale underlying *Rompilla* and *Wiggins* support Tharpe's argument; indeed, the core of *Strickland*, and thus of *Rompilla* and *Wiggins* as well—ensuring counsel's broad discretion in making strategic decisions about representation within the range of reasonable professional conduct under the unique circumstances and challenges presented by the case under review—directly undermines that argument. Tharpe has failed to identify, either in briefing or when pressed at oral argument, what "red flags" requiring further investigation concerning Tharpe's background should have been seen by Newberry and Geeter under the circumstances as they knew or reasonably should have known them to be at the time of their investigation. Instead, Tharpe merely conflates the existence of a contrary picture of Tharpe's upbringing developed ex post on collateral review with Newberry and Geeter's therefore-inadequate ex ante actions. Though

42

Newberry and Geeter surely could have investigated Tharpe's background even further than they did, as will always be true for any lawyer not blessed with unlimited time and resources, the record shows that both the scope and content of their investigation were the result of informed strategic decisions.

A fairminded jurist could, as Judge Winegarden did, reasonably conclude that their investigation was reasonable.

2.

Tharpe next challenges trial counsel's mitigation strategy at the penalty phase, regardless of the adequacy of trial counsel's investigation. Tharpe points us again to his "traumatic and deprived upbringing," his "early introduction to alcohol," and his "family['s] history of intoxicant abuse and addiction." Had these aspects of his identity and life experience been shared with the jury, they could have garnered sympathy and diminished Tharpe's perceived culpability. Because it was unreasonable for trial counsel to forgo this route of mitigation under the circumstances confronting counsel, Tharpe argues, Judge Winegarden unreasonably applied *Strickland* when he concluded that trial counsel's performance had been constitutionally adequate.

We decline Tharpe's invitation to second-guess Newberry and Geeter's decision of how to proceed with the mitigation presentation to the jury at sentencing. That decision, which we concluded above was informed by a

43

reasonable investigation, is "virtually unchallengeable." *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Newberry and Geeter sought to portray Tharpe as a good guy who made a mistake at an emotionally fraught time but who nonetheless deserved the jury's mercy. The efficacy of that approach may well have been diminished had Newberry and Geeter simultaneously presented testimony portraying Tharpe as an alcoholic with low intellectual functioning and a troubled past. Instead of crediting Tharpe's unfortunate circumstances as making him less culpable in the murder of Jaquelin Freeman, the jury could have concluded instead that Tharpe was not willing to accept responsibility for his actions, thus sinking Tharpe's credibility and undermining both the good-character defense and the diminished-capacity defense. *Cf. Cullen v. Pinholster*, 563 U.S. 170, 197, 131 S. Ct. 1388, 1407–08, 179 L. Ed. 2d 557 (2011) ("The current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it." (quotation marks omitted) (quoting *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (en banc), *rev'd*, 563 U.S. 170, 131 S. Ct. 1388 (2011) (Kozinski, C.J., dissenting))). The uncertainty about these sorts of tradeoffs is especially salient because presenting the evidence that Tharpe now contends

Newberry and Geeter unconstitutionally failed to present may have also exposed the jury to Tharpe's history of substance abuse, his unstable work history, and Dr. Storms's and Dr. Moore's impressions of Tharpe as "mean" and a "mean son of a bitch"—exposure that, on balance, may have done more harm to the image of Tharpe as a person of good character than would be outweighed by any corresponding diminishment of his culpability. *Cf. Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 1514, 146 L. Ed. 2d 389 (2000) (holding counsel's performance inadequate for failing to present "comparatively voluminous amount of [mitigation] evidence" when that failure not "justified by a tactical decision"). Though it is true that Newberry and Geeter's chosen mitigation strategy did not achieve the desired result, we cannot say that it was unreasonable solely for that reason.

The Supreme Court's decisions in *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010) (per curiam), *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (per curiam), and *Williams v. Taylor* are not to the contrary.[27] In *Sears*, which the Court reviewed directly after the State's

---

[27] To the extent Tharpe is also citing *Sears*, *Porter*, and *Williams* for the proposition that his counsel's mitigation investigation was unreasonable, we reject Tharpe's reliance on those cases for the same reason we rejected his reliance on *Rompilla* and *Wiggins*: Tharpe has simply failed to show, under the factual circumstances presented here, "red flags" Newberry and Geeter

45

collateral proceedings and thus did not invoke § 2254's deferential lens, the Court

held there was a constitutionally inadequate investigation that "should have, at the

very least, called into question the reasonableness of [counsel's mitigation] theory"

and remanded to the state court for a determination under "the proper prejudice

inquiry," which is not categorically limited to instances when counsel presents

"only 'little or no mitigation evidence.'"  *See* 561 U.S. at 953–54, 130 S. Ct. 3265–

66.[28]  In *Porter*, the Court concluded that counsel had failed to present an adequate

case for mitigation when counsel unreasonably "failed to uncover and present any

evidence of Porter's mental health or mental impairment, his family background,

or his military service," which would have been substantial mitigation evidence.

*See* 558 U.S. at 40–44, 130 S. Ct. at 453–56.  And in *Williams*, the Court held

counsel's mitigation strategy unreasonable when counsel "did not fulfill their

obligation to conduct a thorough investigation of the defendant's background" and

thus failed to uncover the defendant's "nightmarish childhood," leading counsel to

ignore available evidence of the defendant's mitigating life circumstances.  *See*

529 U.S. at 395–96, 120 S. Ct. at 1514–15.

---

unreasonably failed to glimpse during their investigation or what more they reasonably should have done.

[28] On remand, the Georgia Supreme Court unanimously held that the petitioner in *Sears* failed to demonstrate prejudice under *Strickland*.  *Sears v. Humphrey*, 751 S.E.2d 365, 395 (Ga. 2013).

In *Sears*, *Porter*, and *Williams*, then, counsel's mitigation theory was unreasonably chosen (or, in the case of *Sears*, potentially unreasonably chosen) precisely because counsel had failed to conduct a constitutionally adequate investigation, which precluded counsel from conscientiously selecting among the available mitigation theories. Among other relevant differences between those cases and Tharpe's, it is of critical import here that Newberry and Geeter first conducted a reasonable investigation before finally settling on a mitigation strategy.

A fairminded jurist could, as Judge Winegarden did, reasonably conclude that Newberry and Geeter's mitigation strategy was reasonable under the circumstances. As a result, we conclude that Tharpe has failed to show that he is entitled to relief on his *Strickland* ineffective-assistance-of-counsel theory.

B.

Tharpe's second theory of relief is that he is intellectually disabled for purposes of the Eighth Amendment and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002),[29] and that § 2254(d) does not require us to defer to Judge Winegarden's contrary legal

---

[29] Like the Sixth Amendment's right to counsel, the Eighth Amendment's protections against cruel and unusual punishment have been incorporated against the States through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666, 82 S. Ct. 1417, 1420, 8 L. Ed. 2d 758 (1962).

47

conclusions and factual determinations.  Tharpe begins this part of his argument by pointing us to the standardized testing suggesting that his I.Q. score falls somewhere between a 73 and a 66 and to testimony elicited on state collateral review suggesting that Tharpe's impairments in adaptive functioning manifested prior to age 18.  As mentioned above, Georgia's death-penalty law requires that Tharpe also show beyond a reasonable doubt impairments in his adaptive behavior to prove that he is intellectually disabled.  *See* O.C.G.A. § 17-7-131(a)(3).  And this panel, no less than the District Court, is bound by the Eleventh Circuit's en banc ruling upholding the constitutionality of that aspect of Georgia's death-penalty law, at least for purposes of AEDPA review.  *See Hill v. Humphrey*, 662 F.3d 1335, 1360–61 (11th Cir. 2011) (en banc).  Accordingly, we will limit our review to the heart of the matter:  whether Judge Winegarden unreasonably concluded that Tharpe had failed to prove beyond a reasonable doubt that Tharpe suffers from significant deficiencies in his adaptive behavior.[30]

Regarding his adaptive behavior, Tharpe now argues that "the evidence before the state court overwhelmingly supported a finding of significant adaptive deficits in at least two of the ten enumerated areas":  functional academics and

---

[30] To be sure, the State also maintains that Judge Winegarden reasonably concluded that Tharpe had failed to prove beyond a reasonable doubt that any impairment in Tharpe's adaptive behavior had manifested prior to age 18.

48

work.[31]  As to functional academics, Tharpe points to evidence introduced on state collateral review allegedly showing that, "[a]lthough [he] completed the twelfth grade," he struggled throughout his school career; that some of his teachers labelled him "slow" and testified that he had been repeatedly "socially promoted" from one grade to the next; that Tharpe was enrolled in "slow-tracked" vocational programs in high school; and that Tharpe "functions at approximately a 6th grade level."  As to work, Tharpe claims that his employment had generally been of short duration and low skill, and that he "never progressed beyond rudimentary employment skills."

Tharpe also argues that Judge Winegarden unreasonably credited the findings and conclusions of the State's mental-health expert while failing to sufficiently credit the findings and conclusions of Tharpe's experts.  Tharpe argues that Judge Winegarden's credibility determinations were unreasonable because Dr. King, the State's mental-health expert who examined Tharpe on state collateral review, based his report on his own and other mental-health experts' findings but failed to "list any source, apart from Mr. Tharpe himself, which would shed light

---

[31] By narrowing his focus to these two enumerated categories of adaptive behavior, functional academics and work, Tharpe is implicitly abandoning Dr. Zimmerman's conclusions that he also suffered from significant decencies in home living, social skills, and self-direction. Because we agree that Tharpe has correctly recognized that these grounds would not be availing if pressed, we need not address them further.

upon Mr. Tharpe's day-to-day adaptive functioning skills." In contrast, Dr.

Zimmerman relied on affidavits of Tharpe's friends and family; Tharpe's school,

work, and medical records; other mental-health experts' findings; and excerpts of

Tharpe's testimony before the trial court. Tharpe also maintains that Dr. King

improperly relied on the ABAS-II test as part of his evaluation of Tharpe. In

making this argument, Tharpe directs our attention to the testimony of Dr. Thomas

Oakland, a co-author of the ABAS-II, providing that the test may fail to capture

accurate results for purposes of establishing a person's level of adaptive behavior if

administered on patients in prison or those who display evidence of intellectual

disability or low intellectual functioning.[32] Tharpe argues that Judge Winegarden's

reliance on Dr. King despite Dr. Oakland's testimony about the ABAS-II,

testimony which Judge Winegarden did not explicitly address in his order denying

Tharpe habeas relief, taken together with the other evidence elicited from the

evidentiary hearings on state collateral review, could reasonably support only the

conclusion that Tharpe had proven that he suffers from significant impairments in

his adaptive behavior.

---

[32] Tharpe also points, on appeal, to a book Dr. Oakland co-authored, arguing that the ABAS-II may be useful for purposes other than establishing the level of a person's adaptive behavior if administered to persons who are incarcerated or to those who display signs of intellectual disability or low intellectual function.

Whether Tharpe merely has borderline intellectual functioning or whether Tharpe is fully intellectually disabled and thus ineligible for the death penalty for purposes of *Atkins* ultimately boils down to a question of degree as to the extent of the deficiencies in Tharpe's adaptive behavior. And the mental-health experts who have examined Tharpe have been divided in their conclusions. Dr. Moore and Dr. Storms, who examined Tharpe before trial, both concluded that Tharpe was not intellectually disabled. So did Dr. King, who examined Tharpe on state collateral review. In contrast, Dr. Crown and Dr. Zimmerman, who also examined Tharpe on state collateral review, concluded that Tharpe was intellectually disabled. Of course, the mere existence of a division in expert opinion does not necessarily preclude Tharpe from having established that he is intellectually disabled beyond a reasonable doubt, as Tharpe rightly contends. To make that determination, we must assess the content and basis of these experts' opinion in light of the evidence in the record. And there is insufficient evidence presented here to establish that Judge Winegarden's conclusion that Tharpe did not suffer from significant deficiencies in adaptive behavior was unreasonable.

Limiting our review of Tharpe's adaptive behavior to the categories of functional academics and work, as Tharpe now suggests we should, there is sufficient evidence in the record for a fairminded jurist to conclude that Tharpe did not suffer significant deficiencies. As to functional academics, we note that there

51

is evidence showing, among other things, that Tharpe was able to graduate high school and that he can read, write, and perform the basic mathematical tasks required of daily life such as engaging in routine commercial transactions and taking measurements without the assistance of others.  As to work, there is evidence showing that Tharpe was repeatedly able to independently find, secure, and ably perform work in a number of positions throughout his life.  Notably, there is no evidence in the record showing that Tharpe was ever terminated from a position for an inability to perform the work required of him, while there is evidence suggesting that his admittedly unstable work history resulted, at least in part, from Tharpe's substance abuse and issues with rage.  And this evidence of Tharpe's adaptive abilities does not depend on either the extent of Judge Winegarden's reliance on the portion of Dr. King's testimony drawn from the ABAS-II test or whether Dr. King's use of the ABAS-II test was appropriately administered under the circumstances, issues which we need not decide.

Moreover, while Tharpe spends much of his argument targeting the allegedly insufficient basis for Dr. King's conclusions, he largely neglects to mention the shortcomings identified by Judge Winegarden in the dueling testimony of Tharpe's preferred expert, Dr. Zimmerman.  Dr. Zimmerman's conclusion that Tharpe is intellectually disabled stems largely from witnesses' testimony in affidavits generated for evidentiary hearings on state collateral review, much of

52

which may be deemed of dubious value as significant portions of the testimony directly contradict those witnesses' statements at sentencing. Judge Winegarden found similarly dubious many of Dr. Zimmerman's conclusions about Tharpe's adaptive behavior, including Dr. Zimmerman's conclusions about Tharpe's abilities in functional academics and work. For example, Judge Winegarden faulted Dr. Zimmerman for relying too heavily on considerations such as grades, I.Q. scores, and vague statements largely devoid of context such as those from non-experts describing Tharpe as "slow," as having been "socially promoted," and as having been enrolled in "fundamental" classes, while at the same time ignoring evidence of Tharpe's ability to function independently outside a formal academic context. Judge Winegarden also faulted Dr. Zimmerman for overweighting the short-term and low-skilled nature of Tharpe's employment history because Dr. Zimmerman failed to address other potentially causal explanations for Tharpe's employment history such as Tharpe's history of substance abuse, his generally low level of intellectual functioning, and his limited qualifications. Given all this, we agree that the record shows that Tharpe suffered some degree of impairment in his adaptive behavior due to his low intellectual functioning and history of substance abuse. We do not agree, however, that Tharpe has shown, as he must to overcome the deference demanded by § 2254, that these deficiencies are so significant that no fairminded jurist could reasonably conclude that Tharpe had failed to prove beyond

53

a reasonable doubt that his impaired behavior qualified him as intellectually

disabled for purposes of Georgia's death-penalty law.[33]

Accordingly, we reject Tharpe's *Atkins* intellectual-disability claim as well.

IV.

For the foregoing reasons, Tharpe has failed to show that he is entitled to the

relief he seeks under 28 U.S.C. § 2254.  The judgment of the District Court is

AFFIRMED.

---

[33] The relevant supplemental authority provided by Tharpe, *Brumfield v. Cain*, 576 U.S. __, 135 S. Ct. 2269, 192 L. Ed. 2d 356 (2015), is not to the contrary.  In *Brumfield*, a five-member majority of the Supreme Court held that it was unreasonable for purposes of § 2254 for a state trial court to have concluded that a post-*Atkins* petitioner had not shown the "reasonable doubt" required by Louisiana law to merit an evidentiary hearing as to the petitioner's possible intellectual disability when the record showed that the petitioner had a "low birth weight," had been "placed in special education classes at an early age" and "was suspected of having a learning disability," and had been committed to "mental health facilities at a young age" where he had been administered "antipsychotic and sedative drugs."  *See id.* at __, 135 S. Ct. at 2280–81.  The circumstances facing the Court in *Brumfield* are far afield from those we face here.  Most obviously, Tharpe is not seeking an evidentiary hearing to determine whether he is intellectually disabled in the first place; Tharpe is instead contesting Judge Winegarden's conclusion that he is not intellectually disabled, a conclusion reached only after multiple such hearings had been held.  *Cf. id.* at __, 135 S. Ct. at 2281 ("It is critical to remember, however, that in seeking an evidentiary hearing, Brumfield was not obligated to show that he was intellectually disabled, or even that he would likely be able to prove as much.  Rather, Brumfield needed only to raise a 'reasonable doubt' as to his intellectual disability to be entitled to an evidentiary hearing.").