WILLIAM PRYOR, Circuit Judge:
Billy Raulerson Jr., a Georgia prisoner under three death sentences for murdering two teenagers, one of whom he sodomized after killing her, and for murdering a woman he robbed the next day, appeals the denial of his petition for a writ of habeas corpus, 28 U.S.C. § 2254. At trial, Raulerson's counsel argued that he was "guilty but mentally retarded" beyond a reasonable doubt and so ineligible for the death penalty. The jury disagreed and sentenced Raulerson to death. After unsuccessfully pursuing postconviction relief in *992 Georgia courts, Raulerson filed a federal petition, which the district court denied. Raulerson contends that his counsel were ineffective by failing to investigate mitigating evidence and present it during the penalty phase; that the Georgia requirement that a criminal defendant prove his intellectual disability beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment; and that he is actually innocent of the death penalty because he is intellectually disabled. Because the Georgia superior court reasonably determined that the first two claims fail and because Raulerson fails to establish his intellectual disability, we affirm.
I. BACKGROUND
We divide the background of this appeal in three parts. First, we discuss the facts of Raulerson's crime. Next, we describe Raulerson's trial and sentencing. Then, we provide an overview of his state and federal habeas proceedings.
A. The Crime
In a two-day span, Billy Raulerson, Jr. killed three people in Ware County, Georgia. On May 30, 1993, Raulerson parked his car by a pickup truck occupied by two teenagers, Jason Hampton and Charlye Dixon, on a lakeside lovers' lane. Raulerson v. State , 268 Ga. 623, 491 S.E.2d 791, 795-96 (1997). Raulerson stood on the bed of the truck and shot Hampton several times. Id. at 796. As Dixon tried to flee, he shot her. Id. He then "dragged Hampton's body from the truck and shot him several more times." Id. Raulerson went on to take two fishing rods from the truck and put the rods and Dixon in his car. Id. He drove to a wooded area several miles away where he shot Dixon again and sodomized her. Id.
When he tried to return to Dixon's body the next day, people were at the site, so he "drove to a rural section of the county looking for a house to burglarize." Id. He stopped at a home that had no vehicle in the carport. After no one responded to his knock at the door, Raulerson broke into a shed and stole meat from the freezer. Id. When he was loading the meat into his car, he heard someone in the house. Id. Raulerson went inside and encountered Gail Taylor, who was armed with a knife. Id. A struggle ensued, and Raulerson shot Taylor multiple times. Id. He then stole her purse and left. Id. Later that day, the bodies of Hampton, Dixon, and Taylor were discovered in separate locations. Id. at 795.
Several months later, the police arrested Raulerson on unrelated charges. He gave the police a blood sample, which matched the semen recovered from Dixon's body. Id. When the police questioned Raulerson about the murders, he confessed to killing all three people. Id. The police searched Raulerson's home and found the fishing rods taken from Hampton's truck and a gun that matched the shell casings recovered from the crime scenes. Id. A grand jury charged Raulerson with the murders of Dixon, Hampton, and Taylor; burglary; kidnapping; aggravated sodomy; necrophilia ; two counts of possession of a firearm during the commission of a felony; and possession of a firearm by a convicted felon. Id. at 795 n.1.
B. The Trial and Sentencing
Leon Wilson and Mark Hatfield represented Raulerson. Wilson, who served as lead counsel, had tried several capital cases in his 46 years as an attorney, although he had not done so in 20 years when he represented Raulerson. Hatfield, a new attorney, assisted Wilson with the case.
Before trial, Raulerson's counsel conducted an investigation of Raulerson's *993 background. They hired five experts, including a licensed clinical social worker, Audrey Sumner; a psychologist, Dr. Daniel Grant; a psychiatrist, Dr. John Savino; a neurologist, Dr. Michael Baker; and a neuropsychologist, Dr. Manual Chaknis. The experts interviewed Raulerson and his family and reviewed Raulerson's medical, school, and criminal records. Among other things, Raulerson's counsel learned that Raulerson had a tumultuous childhood, abusive parents, substance-abuse issues, and several emotional and intellectual problems.
During the guilt phase of trial, Raulerson's counsel presented the defense that Raulerson was "guilty but mentally retarded." In Georgia, a criminal defendant who proves beyond a reasonable doubt that he is intellectually disabled is ineligible for the death penalty. See O.C.G.A. § 17-7-131(c)(3). In July 2017, Georgia amended section 17-7-131 to substitute the term "mentally retarded" for "intellectual disability." See id. § 17-7-131 ; see also 2017 Ga. Laws 189 § 1. We will use the term "intellectual disability" unless we are quoting directly from the record. See Brumfield v. Cain , --- U.S. ----, 135 S. Ct. 2269, 2274 n.1, 192 L.Ed.2d 356 (2015) ("While this Court formerly employed the phrase 'mentally retarded,' we now use the term 'intellectual disability' to describe the identical phenomenon." (alteration adopted) (citation and internal quotation marks omitted)). To prove intellectual disability, Raulerson needed the jury to determine, beyond a reasonable doubt, that he had "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." O.C.G.A. § 17-7-131.
To support his claim of intellectual disability, Raulerson's counsel presented the expert testimony of their psychologist, Dr. Grant. He testified that he had spent about 15 hours with Raulerson, administered about 25 different tests, interviewed his parents, and reviewed extensive records. Although Raulerson had received IQ scores of 78 and 83 as a child, which are above the range of intellectual disability, Grant testified that his tests determined Raulerson had an IQ around 69 and was "functioning at about a 12-year level." And he testified that Raulerson's deficits onset before age 18 because Raulerson had abused drugs and alcohol at a young age, suffered head injuries, and had memory and attention problems. Grant concluded that Raulerson was intellectually disabled.
Dr. Grant also testified about Raulerson's background. He testified that Raulerson always had trouble in school and never had any friends. He explained that Raulerson had suffered multiple head injuries, including being hit by a car at age three. And Grant described Raulerson's home life. He testified that Raulerson's father was abusive; by age ten, "he and his father would actually get in the yard and fist-fight like two adults." Grant explained that Raulerson's environment made him "predisposed" for substance abuse. After Raulerson began using drugs and alcohol around age ten, Grant testified that Raulerson spent "his leisure time ... drinking or using drugs" and sitting outside his parents' house "just staring out." Grant also discussed Raulerson's failed marriage and his child. He explained that Raulerson had been married at age 18 and had a tumultuous relationship with his then-wife. When she was five months pregnant, Raulerson shot himself in the chest.
The state presented its own expert, Dr. Gerald Lower, who disagreed with some of Dr. Grant's conclusions that led to his diagnosis that Raulerson had an intellectual disability. Dr. Lower's test also determined that Raulerson had an IQ of 69, but *994 he testified that he found signs of malingering. Lower testified that he did not have enough information to make a diagnosis about Raulerson's adaptive functioning. When asked whether there was "any convincing demonstration" that Raulerson had an intellectual disability onset before age 18, he testified, "Absolutely none whatever."
The jury rejected that Raulerson was "guilty but mentally retarded" beyond a reasonable doubt. It convicted him on three counts of capital murder, in addition to burglary, kidnapping, necrophilia, and two counts of possession of a firearm during the commission of a felony.
The penalty phase began the next morning. The state called six witnesses and presented several victim-impact statements. Raulerson's counsel presented no additional witnesses in mitigation and instead relied on the testimony presented during the guilt phase. During Wilson's closing argument, he maintained that although the jury had found that Raulerson was "not ... legally retarded," Raulerson's actions were of a "sick mind" and "not entirely his fault." Wilson urged the jury to consider Raulerson's background and not to impose the death penalty. The court instructed the jury that it could rely on all testimony received in both stages of the proceedings. The jury returned a verdict of death for all three counts of capital murder for which Raulerson was convicted and found the existence of seven statutory aggravating circumstances beyond a reasonable doubt.
Raulerson appealed his convictions and sentences to the Supreme Court of Georgia. He argued, among other things, that section 17-7-131(c)(3), which requires the accused to prove his intellectual disability beyond a reasonable doubt, violated his state right not to be executed if intellectually disabled. In support, Raulerson cited Cooper v. Oklahoma , 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), which held that an Oklahoma requirement that the accused prove his incompetence to be tried by clear and convincing evidence violated the Due Process Clause. The Supreme Court of Georgia rejected his challenge to section 17-7-131(c)(3), and it affirmed Raulerson's convictions and sentences. See Raulerson , 491 S.E.2d at 801 (citing Burgess v. State , 264 Ga. 777, 450 S.E.2d 680 (1994) ). The Supreme Court of the United States denied Raulerson's petition for a writ of certiorari. See Raulerson v. Georgia , 523 U.S. 1127, 118 S.Ct. 1815, 140 L.Ed.2d 953 (1998).
C. The State and Federal Habeas Proceedings
After his direct appeal, Raulerson filed a petition for a writ of habeas corpus in a Georgia superior court. He alleged that his counsel rendered ineffective assistance at the penalty phase of his trial by failing to investigate and present mitigating evidence about his mental health. In the light of Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), he also argued that Georgia's burden of proof to establish intellectual disability violated his federal right not to be executed if intellectually disabled. That is, he argued that section 17-7-131(c)(3) violates the Due Process Clause of the Fourteenth Amendment by failing to protect his right under the Eighth Amendment not to be executed if intellectually disabled. And Raulerson asserted that he is intellectually disabled and cannot be executed under the Eighth Amendment.
The superior court held an evidentiary hearing on these issues. Raulerson presented over 30 affidavits from family, friends, teachers, and mental-health professionals stating that they would have *995 provided testimony on Raulerson's behalf if they had been asked. The affidavits provided details about Raulerson's substance abuse, physical abuse, troubled childhood, and his relationship with his daughter. Raulerson also presented an affidavit and testimony from Dr. Lower, the state's expert at his trial. Lower explained that, after reviewing additional records and testimony, he "would have testified that Mr. Raulerson's I.Q. ... and his deficits in adaptive functioning apparent prior to age 18 support[ ] a diagnosis of Mental Retardation." But Dr. Lower still questioned whether Raulerson's intellectual disability onset before age 18. So even with the additional information, he could not diagnose Raulerson as intellectually disabled.
The superior court denied Raulerson's petition. It denied Raulerson's claim of ineffective assistance of counsel on the merits. It ruled that his due-process claim was barred by res judicata. And relying on precedent from the Supreme Court of Georgia, it also explained that Raulerson's due-process claim failed because Georgia's burden of proof to establish intellectual disability was not unconstitutional under Atkins . The superior court also determined that Raulerson's claim that he is intellectually disabled and so ineligible for the death penalty was barred by res judicata because the jury had rejected that claim. And it determined that Raulerson "failed to present evidence to satisfy the extremely stringent miscarriage of justice standard" because the evidence presented at trial and in habeas proceedings did not "warrant eradication [of] the jury's verdict."
The Supreme Court of Georgia summarily denied Raulerson's application for a certificate of probable cause to appeal. Raulerson then filed a federal petition for a writ of habeas corpus in the district court. Following an evidentiary hearing, the district court denied Raulerson's petition.
II. STANDARDS OF REVIEW
We review de novo the denial of a petition for a writ of habeas corpus. Morrow v. Warden , 886 F.3d 1138, 1146 (11th Cir. 2018). The Antiterrorism and Effective Death Penalty Act, which governs Raulerson's petition, provides "[a] general framework of substantial deference [for] our review of every issue that the state courts have decided." Diaz v. Sec'y for the Dep't of Corr. , 402 F.3d 1136, 1141 (11th Cir. 2005). Under that Act, a federal court shall not grant habeas relief on any claim "adjudicated on the merits" in state court unless, as relevant here, the state court's decision denying relief was either "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established federal law" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Yarborough v. Alvarado , 541 U.S. 652, 660-61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting Terry Williams v. Taylor , 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ). The decision of a state court is "contrary to" clearly established federal law when the state court "applied a rule in contradiction to governing Supreme Court case law" or "arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." Dill v. Allen , 488 F.3d 1344, 1353 (11th Cir. 2007). And a state court's application of federal law is unreasonable "only if no 'fairminded jurist' could agree with the state court's determination or conclusion." Holsey v. Warden, Ga. Diagnostic Prison , 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *996 Harrington v. Richter , 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ); see also Harrington , 562 U.S. at 101, 131 S.Ct. 770 ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). Section 2254(d)(1) sets "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster , 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (citation and internal quotation marks omitted).
III. DISCUSSION
Raulerson raises three issues for our review. First, he argues that the superior court unreasonably determined that his attorneys were not deficient for failing to investigate mitigating evidence and to present it during the penalty phase and that he suffered no prejudice. Second, he argues that the superior court unreasonably applied clearly established law when it ruled that the Georgia requirement that he prove his intellectual disability beyond a reasonable doubt did not violate the Due Process Clause of the Fourteenth Amendment. Third, he argues that he is intellectually disabled and so actually innocent of the death penalty.
As an initial matter, our discussion focuses on the reasonableness of the superior court's decision even though it is not the last state-court "adjudicat[ion] on the merits," 28 U.S.C. § 2254(d). The Supreme Court of Georgia's summary denial of Raulerson's application for a certificate of probable cause to appeal was the last state-court adjudication on the merits. Hittson v. GDCP Warden , 759 F.3d 1210, 1231-32 (11th Cir. 2014). But we "presume" that the summary denial adopted the superior court's reasoning unless the state "rebut[s] the presumption by showing that the [summary denial] relied or most likely did rely on different grounds," which the state has not tried to do in this appeal. Wilson v. Sellers , --- U.S. ----, 138 S. Ct. 1188, 1192, 200 L.Ed.2d 530 (2018). So we " 'look through' the unexplained decision" of the Supreme Court of Georgia to review the superior court's decision as if it were the last state-court adjudication on the merits. See id.
A. The Superior Court Reasonably Determined that Trial Counsel Were Not Ineffective for Failing to Investigate Mitigating Evidence and to Present It During the Penalty Phase.
To obtain relief on his claim of ineffective assistance of counsel, Raulerson must establish two elements. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, he must prove that "his counsel's performance was deficient, which means that it 'fell below an objective standard of reasonableness' and was 'outside the wide range of professionally competent assistance.' " Johnson v. Sec'y, Dep't of Corr. , 643 F.3d 907, 928 (11th Cir. 2011) (quoting Strickland , 466 U.S. at 688, 690, 104 S.Ct. 2052 ). When considering whether counsel's performance was deficient, we "review counsel's actions in a 'highly deferential' manner" and apply "a strong presumption ... of reasonable professional assistance." Id. (quoting Strickland , 466 U.S. at 689, 104 S.Ct. 2052 ). Second, Raulerson must establish prejudice, which means that "but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." Id. (quoting Strickland , 466 U.S. at 694, 104 S.Ct. 2052 ). Because Strickland provides a "most deferential" standard for assessing the performance of counsel, "[w]hen [we] combine[ ] [it] with the extra layer of deference that § 2254 provides, *997 the result is double deference." Id. at 910-11. So "the question becomes whether there is any reasonable argument that counsel satisfied Strickland 's deferential standard." Id. (citation and internal quotation marks omitted).
Raulerson first argues that his trial counsel were ineffective by failing to investigate mitigating evidence about his troubled childhood, his love for his child, and his mental illness. During the state habeas proceedings, Raulerson presented affidavits from over 30 family members, teachers, acquaintances, and mental-health professionals that he contends his counsel should have interviewed. Raulerson argues that these witnesses could have presented a more sympathetic portrait of him.
Counsel representing a capital defendant must conduct an adequate background investigation, but it need not be exhaustive. See Berryman v. Morton , 100 F.3d 1089, 1101 (3d Cir. 1996) ("The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."). When our review is governed by section 2254, "the question is not just if counsel's investigative decisions were reasonable, but whether fairminded jurists could [reasonably] disagree." Johnson , 643 F.3d at 932.
To determine whether "trial counsel should have done something more" in their investigation, "we first look at what the lawyer[s] did in fact." Grayson v. Thompson , 257 F.3d 1194, 1219 (11th Cir. 2001) (citation and internal quotation marks omitted omitted). Raulerson's counsel hired five experts to assist in their investigation: a licensed clinical social worker, a psychologist, a psychiatrist, a neurologist, and a neuropsychologist. The social worker, Audrey Sumner, interviewed Raulerson, his mother, his father, and two uncles. Her report crafted an extensive social history of Raulerson's life that described the physical and verbal abuse he suffered at the hands of both of his parents, his struggles with depression and substance abuse, his suicide attempt, and various incidents displaying his rage. The psychologist, Dr. Grant, also met with Raulerson, for at least fifteen hours, and interviewed his parents. And Dr. Grant examined extensive medical, school, and criminal records. Dr. Grant's report included background information about Raulerson and diagnoses of intellectual disability and several mental illnesses. The psychiatrist, Dr. Savino, met with Raulerson on at least eight separate occasions and reviewed Raulerson's records. Dr. Savino diagnosed Raulerson as mentally ill and intellectually disabled, and he suggested that Raulerson might have organic brain damage. To investigate potential brain damage, Raulerson's counsel hired Drs. Baker and Chaknis, a neurologist and neuropsychologist respectively. Several of the experts also reviewed Raulerson's case together. In addition to the work of these five experts, Raulerson's counsel performed their own interviews of Raulerson's mother, father, brother, and an uncle. Counsel also had Raulerson write out his life history.
The superior court reasonably concluded that trial counsel conducted an adequate investigation. Raulerson's counsel gleaned a portrait of his life from the expert reports, family interviews, and medical, school, and criminal records. Although Raulerson has presented additional affidavits from extended family members, teachers, and acquaintances that counsel could have interviewed, that more investigation could have been performed does not mean his counsel's investigation was inadequate. Grayson , 257 F.3d at 1225 ("[C]ounsel is not required to investigate and present all mitigating evidence in order to be reasonable." (emphasis added)). From their investigation, counsel learned much *998 of the information contained in the affidavits, including details on Raulerson's troubled childhood, abusive parents, difficulties in school, and intellectual deficiencies. And because Raulerson has pointed to no "known evidence [that] would lead a reasonable attorney to investigate further," Wiggins v. Smith , 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), he has provided no argument that his counsel acted unreasonably when they decided to end the investigation when they did. Because the superior court reasonably determined that Raulerson's counsel conducted an adequate investigation, we need not consider whether Raulerson suffered prejudice.
Raulerson next argues that his counsel were ineffective because they decided not to present additional mitigating evidence during his penalty phase, but again, the superior court reasonably rejected this claim. "No absolute duty exists to introduce mitigating or character evidence." Chandler v. United States , 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc) (collecting cases). And we have held, in a capital case, that counsel's performance was not deficient when he chose to rely on the mitigating evidence presented in the guilt phase instead of presenting additional evidence during the penalty phase. Waters v. Thomas , 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). We explained that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Id.
The superior court reasonably determined that Raulerson's counsel were not deficient when they presented no additional mitigating evidence during the penalty phase. As counsel in Waters had done, Raulerson's counsel chose to rely on the mitigating evidence presented in the guilt phase instead of presenting it again in the penalty phase. See id. at 1512-13. During the guilt phase, his counsel presented mitigating evidence that included descriptions of Raulerson's intellectual deficiencies and life history. Dr. Grant testified about Raulerson's trouble in school, his emotional and intellectual problems, his marriage, his relationship with his child, and his tumultuous home life, including his abusive father.
After the jury returned a guilty verdict, Raulerson's counsel chose to rely on this evidence for the penalty phase. Raulerson's counsel presented a closing argument urging the jury to consider Raulerson's background and spare him. Counsel reminded the jury to "[g]o back and look at the circumstances of Billy Raulerson's life, the way he was raised, this dysfunctional family, parents that fought like animals with each other; an alcoholic father who taught him to mind with blows of his fists to his head .... What chance did he have? Isn't he a victim, too?" And the court instructed the jury that it could rely on all testimony received in both stages of the proceedings. The superior court reasonably chose not to second guess counsel's strategic decision to rely on the mitigating evidence presented in the guilt phase, so neither can we.
Raulerson presents a plethora of additional character evidence that he contends his counsel should have presented, but "[c]onsidering the realities of the courtroom, more is not always better." Chandler , 218 F.3d at 1319 ; see also Waters , 46 F.3d at 1512 ("There is much wisdom for trial lawyers in the adage about leaving well enough alone."). "The type of 'more-evidence-is-better' approach advocated by [Raulerson] might seem appealing-after all, what is there to lose?" Wong v. Belmontes , 558 U.S. 15, 25, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009). But there can be a lot to lose. Id. By presenting a "heavyhanded case" of mitigation evidence, counsel *999 "would have invited the strongest possible evidence in rebuttal." Id. A lawyer can reasonably "fear that character evidence might, in fact, be counterproductive." Chandler , 218 F.3d at 1321. Particularly right before the jury decides a defendant's penalty, counsel can reasonably limit the mitigating evidence he presents to avoid exposure "to a new string of [g]overnment witnesses who could testify to Petitioner's bad acts." Id. at 1323.
As the superior court highlighted, a reasonable lawyer could fear that additional evidence of Raulerson's character during the penalty phase would be counterproductive, which is exactly what Raulerson's counsel explained had motivated their decision to not present additional mitigating evidence. Hatfield testified that they decided not to call Grant or Savino back to the stand for fear of "opening the flood gates" for "bad stuff." And they decided not to call Raulerson's family members to testify out of concern that "they would be able to offer other negative information that might have hurt" Raulerson's case. Hatfield was concerned about testimony that Raulerson was an aggressor because "those sorts of things don't play well in front of a jury." Counsel knew from their investigation that Raulerson had frequently picked fights, bullied other children, and had abused his younger brother, mother, and ex-wife. And Raulerson, "who bears the burden in this case, never presented evidence that the fears of trial counsel about hurtful ... witnesses were imaginary and baseless." Chandler , 218 F.3d at 1323 n.36.
We also disagree with Raulerson that, because the jury had already heard harmful information about him, presenting mitigating evidence would not be counterproductive. We cannot overlook that Raulerson's counsel faced an uphill battle in the light of the brutality of the three murders Raulerson confessed he had committed. And his counsel reasonably feared that presenting additional mitigating evidence would have invited testimony about Raulerson's violent behavior and bad acts-aggravating evidence that far outweighed any mitigation value of the additional evidence Raulerson contends should have been presented. For example, had counsel called Raulerson's mother, she might have also testified about how her son beat her and how she had called the police on him. Because Raulerson has failed to prove that "no competent counsel would have taken the action that his counsel did take," id. at 1315, the superior court reasonably determined that counsel's performance was not deficient.
Even if counsel's performance in the penalty phase were deficient, the superior court also reasonably determined that Raulerson was not prejudiced by the failure to introduce the additional mitigating evidence. A petitioner cannot establish that the outcome of the proceeding would have been different when "[t]he 'new' evidence largely duplicated the mitigation evidence at trial." Cullen , 563 U.S. at 200, 131 S.Ct. 1388 ; see also Holsey , 694 F.3d at 1260-61. And "[t]o the extent the state habeas record includes new ... evidence," that evidence cannot prove prejudice when it is of "questionable mitigating value." Cullen , 563 U.S. at 201, 131 S.Ct. 1388.
The superior court reasonably determined that Raulerson's additional evidence would not have changed the jury's verdict. The superior court reasonably determined that much of the "new" evidence in the affidavits that Raulerson presented was cumulative. That is, the evidence Raulerson presented "tells a more detailed version of the same story told at trial," which covered Raulerson's limited intelligence and troubled childhood. Holsey , 694 F.3d at 1260. And the evidence was of questionable *1000 mitigating value because it could have led to a damaging rebuttal. See Cullen , 563 U.S. at 201, 131 S.Ct. 1388. If counsel had introduced additional testimony about Raulerson's relationship with his daughter to make him seem more sympathetic, such testimony could have opened the door to testimony about how Raulerson abused his ex-wife. And additional evidence about Raulerson's family and his own substance abuse might have led the jury to conclude that he "was simply beyond rehabilitation," so that evidence is "by no means clearly mitigating." Id. The superior court reasonably discounted this evidence as cumulative and of questionable value.
B. The Superior Court's Determination that the Georgia Burden of Proof for Intellectual Disability Does Not Violate the Due Process Clause Was Not an Unreasonable Application of Clearly Established Federal Law.
We divide in two parts our discussion of Raulerson's argument that the Georgia requirement that he prove his intellectual disability beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment. First, we explain that the superior court adjudicated his due-process claim on the merits, so we apply the deferential framework imposed by section 2254(d)(1). Second, we explain that the superior court's rejection of his due-process claim was not an unreasonable application of clearly established federal law.
1. The Superior Court Rejected Raulerson's Due-Process Claim on the Merits, so We Apply the Deferential Framework of Section 2254(d)(1).
Raulerson argues that we should review de novo his due-process claim because the superior court never adjudicated it on the merits. According to Raulerson, the superior court concluded that the Supreme Court of Georgia had rejected the claim on direct appeal and so dismissed his due-process claim based only on res judicata. Raulerson argues that the court erred in applying res judicata because the due-process claim he now brings on collateral review is based on federal law but his claim on direct appeal-which the Supreme Court of Georgia rejected-was based on Georgia law. Based on that asserted error, Raulerson argues that no state court adjudicated his federal due-process claim on the merits, which would, if correct, subject his claim to de novo review. See Cone v. Bell , 556 U.S. 449, 466, 472, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).
When we consider the superior court's order denying Raulerson's petition in full, we have no trouble concluding that it rejected his federal due-process claim on the merits. "[A] decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed." Wright v. Sec'y for Dep't of Corr. , 278 F.3d 1245, 1255-56 (11th Cir. 2002). To be sure, the court addressed Raulerson's due-process claim within a section of its opinion titled "Claims that are Res Judicata." And it referenced the Supreme Court of Georgia's denial of that claim on direct appeal. So we agree with Raulerson that the superior court dismissed his claim in part because of res judicata. But it did not dismiss the claim only because of res judicata.
The court alternatively decided the merits of Raulerson's claim. It rejected Raulerson's argument that the Supreme Court's decision in Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), established that Georgia's burden of proof for intellectual disability was unconstitutional. And it found Head v. Hill , 277 Ga. 255, 587 S.E.2d 613, 621 (2003) -in which the Supreme Court of Georgia held that its burden of proof did not violate "federal constitutional law"-"controlling." Both of these decisions postdate the rejection of Raulerson's due-process claim on *1001 direct appeal, so the superior court's reference to them establishes that it alternatively rejected Raulerson's federal due-process claim on the merits. Under Georgia law, this alternative holding is binding. See World Harvest Church, Inc. v. GuideOne Mut. Ins. Co. , 586 F.3d 950, 958 (11th Cir. 2009) (explaining that Georgia courts consider alternative holdings binding); QOS Networks Ltd. v. Warburg, Pincus & Co. , 294 Ga.App. 528, 669 S.E.2d 536, 541 (2008) ("Where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, but the court actually decides all such points, the case is an authoritative precedent as to every point decided, and none of such points can be regarded as having merely the status of a dictum." (citation omitted)).
We join our sister circuits in holding that a state court's alternative holding is an adjudication on the merits. See Rolan v. Coleman , 680 F.3d 311, 319-21 (3d Cir. 2012) ("[W]here a state court has considered the merits of the claim, and its consideration provides an alternative and sufficient basis for the decision, such consideration warrants deference."); Sharpe v. Bell , 593 F.3d 372, 382 (4th Cir. 2010) ("[A] state court's alternative holding on the merits of a constitutional claim qualifies for deference under Section 2254(d)."); Brooks v. Bagley , 513 F.3d 618, 624 (6th Cir. 2008) (same). Because the superior court adjudicated the merits of Raulerson's due-process claim, we must review the denial of that claim under the deferential framework set forth in section 2254(d)(1).
2. The Superior Court's Rejection of Raulerson's Due-Process Claim Was Not an Unreasonable Application of Clearly Established Federal Law.
Raulerson argues that, even under the deferential framework of section 2254(d)(1), the superior court's rejection of his due-process claim was an unreasonable application of clearly established federal law. According to Raulerson, the Supreme Court's holdings in Atkins and Cooper clearly establish that the application of Georgia's beyond-a-reasonable-doubt standard to his claim of intellectual disability violated his right to due process under the Fourteenth Amendment by failing to protect his Eighth Amendment right not to be executed if intellectually disabled. Because neither Atkins nor Cooper so held, this argument fails.
Raulerson first relies on Atkins , but that decision did not address the burden of proof to prove intellectual disability, much less clearly establish that a state may not require a defendant to prove his intellectual disability beyond a reasonable doubt. In Atkins , the Supreme Court held that the execution of the intellectually disabled violates the Eighth Amendment. See 536 U.S. at 321, 122 S.Ct. 2242. But as we have explained, "the Supreme Court in Atkins made no reference to, much less reached a holding on, the burden of proof." See Hill v. Humphrey , 662 F.3d 1335, 1347 (11th Cir. 2011) (en banc). To the contrary, the Supreme Court expressly "le[ft] to the States the task of developing appropriate ways" to identify intellectual disability. Atkins , 536 U.S. at 317, 122 S.Ct. 2242 (alterations adopted) (quoting Ford v. Wainwright , 477 U.S. 399, 405, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) ). So " Atkins established only a substantive Eighth Amendment right for the mentally retarded" and established no "minimum procedural due process requirements for bringing that Eighth Amendment claim." Hill v. Humphrey , 662 F.3d at 1360 ; see also Bobby v. Bies , 556 U.S. 825, 831, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009) (explaining that Atkins "did not provide definitive procedural *1002 or substantive guides for determining when a person" is intellectually disabled). And we cannot "import a procedural burden of proof requirement" that the Supreme Court declined to adopt in our review of a habeas petition. Hill v. Humphrey , 662 F.3d at 1360.
Raulerson contends that the Court clearly established a procedural limitation on the burden of proof "by invoking Ford ," see Atkins , 536 U.S. at 317, 122 S.Ct. 2242, but that argument reads too much into a lone citation to Ford . In Ford , the Supreme Court, in Justice Powell's controlling concurrence, held that prisoners who made a substantial threshold showing of incompetence to be executed were entitled to a hearing on that claim. 477 U.S. at 426, 106 S.Ct. 2595 (Powell, J., concurring in part and in the judgment). "The citation in Atkins , however, not only was not to that portion of Ford , it was not even to Justice Powell's opinion in Ford. " Brumfield , 135 S. Ct. at 2294 (Thomas, J., dissenting). And neither the plurality opinion in Ford nor Justice Powell's concurring opinion even mentioned the burden of proof for claims of incompetence. So Atkins 's citation to Ford cannot clearly establish a procedural limitation on the burden of proof for intellectual disabilities.
Acknowledging that Atkins expressly left procedural rules to the states, Raulerson next argues that considering Atkins in conjunction with Cooper yields clearly established minimum procedural requirements to prove intellectual disability, but even the combination of these decisions does not suffice. In Cooper , the Supreme Court addressed whether an Oklahoma law that required a defendant to prove his incompetence to stand trial by clear and convincing evidence violated the Due Process Clause. To resolve that issue, the Court applied the general due-process standard first articulated in Patterson v. New York , 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) -whether the criminal procedural rule "offends a principle of justice that is [so] deeply rooted in the traditions and conscience of our people" as to be considered fundamental. Cooper , 517 U.S. at 362, 116 S.Ct. 1373 (citation and internal quotation marks omitted). The Court had already held that requiring a defendant to prove his incompetence by a preponderance of the evidence did not violate this standard. See Medina v. California , 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). But contrasting the longstanding right not to be tried if incompetent with the lack of historical support for Oklahoma's clear-and-convincing standard, the Court concluded that the heightened standard offended a principle of justice deeply rooted in the traditions and conscience of our people. Cooper , 517 U.S. at 359-60, 362, 116 S.Ct. 1373.
Raulerson's comparison between the right not to be tried if incompetent and the right not to be executed if intellectually disabled is misplaced. Unlike the right at issue in Cooper , which has deep roots in our common-law heritage, there is no historical right of an intellectually disabled person not to be executed. See Hill v. Humphrey , 662 F.3d at 1350. Indeed, as recently as 1989, the Supreme Court refused to bar the execution of the intellectually disabled. See Penry v. Lynaugh , 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Georgia's reasonable-doubt standard, enacted 30 years ago, was "the first state statute prohibiting such executions." Atkins , 536 U.S. at 313-14, 122 S.Ct. 2242 ; see also Hill v. Humphrey , 662 F.3d at 1350-51. "And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right." Hill v. Humphrey , 662 F.3d at 1350.
*1003 In the light of these fundamental differences, Cooper did not clearly establish that the application of Georgia's beyond-a-reasonable-doubt standard to Raulerson's claim of intellectual disability violated his right to due process under the Fourteenth Amendment. To conclude otherwise would require us to extend the Court's rationale from incompetence to intellectual disability. That we cannot do. See White v. Woodall , 572 U.S. 415, 426, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014) (" '[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.' " (quoting Yarborough , 541 U.S. at 666, 124 S.Ct. 2140 )).
In the "controlling" decision the superior court applied to reject Raulerson's due-process claim on the merits, the Supreme Court of Georgia reasoned that the burden of proof required to prove the defense of insanity is "more closely analogous to the burden of proof standard in Georgia's mental retardation statute than is the mental incompetency" burden. Hill v. Humphrey , 662 F.3d at 1350 (glossing Head v. Hill , 587 S.E.2d at 621-22 ). And the Supreme Court has rejected a due-process challenge to a state law that required a defendant to prove his insanity beyond a reasonable doubt. See Leland v. Oregon , 343 U.S. 790, 798-99, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). We held in Hill v. Humphrey that it was reasonable for the Supreme Court of Georgia to conclude that the burden of proof for intellectual disability is analogous to insanity, which permits a beyond-a-reasonable-doubt standard. See 662 F.3d at 1350. Nothing the Supreme Court has said since then changes that conclusion.
Our dissenting colleague's contrary conclusion disregards the nature of our inquiry. This Court cannot "answer the due process question presented here" based on how we would apply federal law. Dissenting Op. at 1011-12. We review only whether the superior court's decision was "contrary to, or involved an unreasonable application of, clearly established [f]ederal law," 28 U.S.C. § 2254(d)(1), which refers only to the holdings of the Supreme Court's decisions, see Yarborough , 541 U.S. at 660-61, 124 S.Ct. 2140. Our dissenting colleague infers that Cooper and Leland establish different procedural standards for constitutional and nonconstitutional rights respectively, see Dissenting Op. at 1011-12, but neither decision so holds. And the dissent's inference of an unstated rationale underlying their divergent outcomes does not amount to clearly established federal law. See Yarborough , 541 U.S. at 660-61, 124 S.Ct. 2140. Indeed, Leland did not even hold that the right to present an insanity defense was not constitutionally based, so this key premise of the dissent's argument that Head v. Hill transgressed clearly established federal law is itself not clearly established. In any event, although Cooper established a procedural standard for one constitutional right-the right not to be tried if incompetent-it does not follow that Cooper clearly established a procedural standard applicable to all constitutional rights. See Morrissey v. Brewer , 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands"). Our dissenting colleague's extension of Cooper from the context of incompetency to stand trial to the distinct context of ineligibility for the death penalty because of intellectual disability is just that-an extension-and section 2254(d)(1) neither "require[s] state courts to extend [Supreme Court] precedent [n]or license[s] federal courts to treat the failure *1004 to do so as error." Woodall , 572 U.S. at 426, 134 S.Ct. 1697.
No decision of the Supreme Court clearly establishes that Georgia's burden of proof for intellectual disability violates the Due Process Clause. "If the standard of proof Georgia has adopted for claims of [intellectual disability] is to be declared unconstitutional, it must be done by the Supreme Court in a direct appeal, in an appeal from the decision of a state habeas court, or in an original habeas proceeding filed in the Supreme Court." Hill v. Humphrey , 662 F.3d at 1361. Because the Court has not done so, the superior court's decision was not an unreasonable application of clearly established federal law.
C. Raulerson Fails to Establish His Intellectual Disability by Clear and Convincing Evidence.
Raulerson argues that he is "actually innocent" of the death penalty because he is intellectually disabled, and under Atkins , the execution of an intellectually disabled person would violate the Eighth Amendment. This argument needlessly blends the distinct concepts of actual innocence and intellectual disability, but even when we sift through each, Raulerson's claim fails.
Considered as a freestanding claim of actual innocence of the death penalty, Raulerson's claim is a nonstarter. To begin with, our precedent forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction "absent an independent constitutional violation occurring in the underlying state criminal proceeding." See Brownlee v. Haley , 306 F.3d 1043, 1065 (11th Cir. 2002) (citation and internal quotation marks omitted); see also Cunningham v. Dist. Att'y's Office , 592 F.3d 1237, 1273 (11th Cir. 2010) ("[An] assertion of actual innocence, by itself, is not enough."); Jordan v. Sec'y, Dep't of Corr. , 485 F.3d 1351, 1356 (11th Cir. 2007). As we have explained, "[i]t is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial." Brownlee , 306 F.3d at 1065. And the Supreme Court has never held that a prisoner is "entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins , 569 U.S. 383, 392, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013).
The prohibition on freestanding claims of actual innocence in a habeas petition respects the nature of our federal system: "Federal courts are not forums in which to relitigate state trials." Herrera v. Collins , 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (quoting Barefoot v. Estelle , 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) ). When reviewing a habeas petition, we "sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." Id . at 400, 113 S.Ct. 853. And "[f]ew rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence." Id. at 401, 113 S.Ct. 853.
To be sure, a prisoner may assert actual innocence to overcome a procedural bar that would otherwise prevent a federal court from hearing his claim on the merits. See Sawyer v. Whitley , 505 U.S. 333, 338-39, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) ; see also Herrera , 506 U.S. at 404, 113 S.Ct. 853. But that way of escaping a procedural bar concerns "factual innocence, not mere legal insufficiency." McKay v. United States , 657 F.3d 1190, 1197 (11th Cir. 2011). And even when the Supreme Court has "assume[d] for the sake of argument"-but without deciding-that "a truly persuasive demonstration of 'actual innocence' [as a freestanding claim] ... would render the execution of a defendant unconstitutional," it meant actual innocence *1005 of the crime . Herrera , 506 U.S. at 417, 113 S.Ct. 853. Raulerson neither raises actual innocence to overcome a procedural bar nor argues that he is actually innocent of the murders for which he was convicted.
Although Raulerson frames his claim as one of actual innocence, it rests on the notion that he is "actually innocent" of the death penalty because he is intellectually disabled and so his execution would violate the Eighth Amendment-that is, in essence, an Atkins claim. See Atkins , 536 U.S. at 321, 122 S.Ct. 2242. A claim of a federal constitutional violation, in contrast with a freestanding claim of actual innocence, is a ground for federal habeas relief. See Herrera , 506 U.S. at 400, 113 S.Ct. 853 ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." (emphasis added)). So Raulerson may pursue his claim not because of actual innocence but because he argues that his execution would violate the Constitution. We put aside Raulerson's misplaced "actual innocence" rhetoric and consider his argument as an Atkins claim. But even when we give Raulerson's Atkins claim the benefit of every doubt, it fails.
We begin by making two assumptions that favor Raulerson. First, although the parties dispute whether Raulerson exhausted this Atkins claim, we will assume that he did. Second, we will assume that Raulerson's Atkins claim has not been "adjudicated on the merits" by any Georgia court, so we will not apply the deferential standard of section 2254(d), which would require us to deny relief unless the rejection of Raulerson's Atkins claim was unreasonable "in the light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) ; see also Cullen , 563 U.S. at 181, 131 S.Ct. 1388 ("[R]eview under § 2254(d)(1) [also] is limited to the record that was before the state court that adjudicated the claim on the merits.").
The superior court rejected Raulerson's Atkins claim on the ground of res judicata, which is not an adjudication on the merits for our purposes. See Cone , 556 U.S. at 466, 472, 129 S.Ct. 1769. And the Supreme Court of Georgia's denial of a certificate of probable cause presumably rested on the same ground. See Wilson , 138 S. Ct. at 1192. So, if Raulerson's Atkins claim was ever adjudicated on the merits, it must have been when the jury rejected his defense of intellectual disability or when the Supreme Court of Georgia affirmed the jury verdict. That Raulerson's Atkins claim was adjudicated by the jury and on direct appeal is a plausible interpretation but is in some tension with the longstanding principle that a "claim" in habeas consists of a "particular legal basis" wedded to a "specific factual foundation." McNair v. Campbell , 416 F.3d 1291, 1302 (11th Cir. 2005) (emphases added) (quoting Kelley v. Sec'y for Dep't of Corr. , 377 F.3d 1317, 1344-45 (11th Cir. 2004) ). In the context of exhaustion, "it is not at all clear that a petitioner can exhaust a federal claim by raising an analogous state claim," even if the federal and state rights are identical in content. Preston v. Sec'y, Fla. Dep't of Corr. , 785 F.3d 449, 460 (11th Cir. 2015).
By the same token, it is not immediately obvious that Raulerson's jury or the Supreme Court of Georgia decided Raulerson's Atkins claim-which is based on his right not to be executed if intellectually disabled under the federal Constitution-when they rejected his state-law defense of intellectual disability. When Raulerson was tried, he had a right not to be executed if intellectually disabled under Georgia law, *1006 but the Supreme Court had not yet decided Atkins , which acknowledged a corresponding federal right. So we will give Raulerson the benefit of this doubt and assume without deciding that his Atkins claim has never been adjudicated on the merits.
Even if Raulerson escapes the gauntlet of section 2254(d) because no state court adjudicated his claim based on Atkins , there was a determination of the factual issue of his intellectual disability, and we must presume correct "a determination of a factual issue made by a State court." 28 U.S.C. § 2254(e)(1). Whether a person is intellectually disabled is a factual issue. Fults v. GDCP Warden , 764 F.3d 1311, 1319 (11th Cir. 2014). The jury determined that issue against Raulerson when it rejected his defense of intellectual disability. See Restatement (Second) of Judgments § 27 cmt. d (Am. Law Inst. 1982) ("A determination may be based on a failure of ... proof as well as on the sustaining of the burden of proof."). And the Supreme Court of Georgia held that the jury verdict was rational. Raulerson , 491 S.E.2d at 796. Because the state courts determined that Raulerson is not intellectually disabled and that determination is entitled to be presumed correct, he bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).
The precise scope of the "determination of [the] factual issue" which Raulerson must rebut is not immediately obvious. The most generous interpretation of section 2254(e)(1) is that it provides the primary standard of proof whenever a state prisoner desires to prove a factual issue that was determined against him in state court. If so, then a state prisoner may establish that a state court's factual determination was incorrect by proving the contrary proposition-in Raulerson's case, that he is intellectually disabled-by clear and convincing evidence as if in the first instance.
But section 2254(e)(1) could also be understood to establish, not a primary standard of proof, but a secondary standard of persuasion that operates in tandem with the original standard of proof applied by the state court. If so, then a state prisoner must prove by clear and convincing evidence that a state court's factual determination was incorrect in the light of the standard of proof that state law applies to that issue. See Maldonado v. Thaler , 625 F.3d 229, 236, 241 (5th Cir. 2010) (applying section 2254(e)(1) to a claim of intellectual disability, explaining that the petitioner "bears the burden of establishing by a preponderance of the evidence that he is mentally retarded"-the Texas burden of proof for intellectual disability-and finding that the petitioner "did not rebut the [ section 2254(e)(1) ] presumption of correctness that attaches to the state habeas court's conclusion that [he] did not meet his [state-law] burden"); cf. Tharpe v. Warden , 834 F.3d 1323, 1344-47 (11th Cir. 2016). In other words, it may be that the state's burden of proof is incorporated into the determination that the prisoner must rebut by clear and convincing evidence. On this interpretation, Raulerson must rebut-by clear and convincing evidence-the determination that it is not beyond a reasonable doubt that he is intellectually disabled.
Such compound standards are far from unusual in federal habeas review of state-court proceedings. See, e.g. , 28 U.S.C. § 2254(e)(2)(B) (To obtain an evidentiary hearing in federal court, the petitioner must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty *1007 of the underlying offense."); Sawyer , 505 U.S. at 336, 112 S.Ct. 2514 ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."); Tharpe , 834 F.3d at 1345 (When section 2254(d) applies to a Georgia court's rejection of an Atkins claim, "the heart of the matter" is "whether [the state court] unreasonably concluded that [the petitioner] had failed to prove beyond a reasonable doubt that" he is intellectually disabled. (emphases added)). By contrast, the more lenient interpretation would be unusual; even with a demanding standard of proof, permission for state prisoners to relitigate already-decided factual issues as if in the first instance would be a surprising departure from the structure and objectives of the Antiterrorism and Effective Death Penalty Act. But, because the outcome of this appeal does not depend on the answer, we assume without deciding that the more lenient interpretation is correct.
To recap, we have now made three important assumptions in Raulerson's favor. We have assumed his Atkins claim is exhausted. We have also assumed that it was not adjudicated on the merits, so the rigorous standards of section 2254(d) do not apply. And we have assumed that section 2254(e)(1) permits him to prove that he is intellectually disabled-and ineligible for the death penalty-by providing clear and convincing evidence to a federal court in the first instance. In practice, this amounts to the assumption that a state prisoner may prove the factual predicate of an Atkins claim in federal court with clear and convincing evidence even when the state in which he was convicted and sentenced imposes a more demanding burden of proof for precisely the same factual issue-a particularly generous assumption in the light of the Atkins Court's express decision to "leave to the States the task of developing appropriate ways to enforce [Atkins 's] constitutional restriction." Atkins , 536 U.S. at 317, 122 S.Ct. 2242 (alteration adopted) (quoting Ford , 477 U.S. at 416, 106 S.Ct. 2595 ).
Even with these assumptions in his favor, Raulerson is not entitled to relief based on his Atkins claim because the record does not clearly and convincingly prove that he is intellectually disabled. The clear-and-convincing-evidence standard, although not "insatiable," is still "demanding." Miller-El v. Dretke , 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). We have explained that it "calls for proof that a claim is 'highly probable.' " Fults , 764 F.3d at 1314 (alterations adopted) (quoting United States v. Owens , 854 F.2d 432, 436 (11th Cir. 1988) ). To succeed on his claim, Raulerson must provide clear and convincing evidence of the three components of Georgia's definition of "intellectual disability": "significantly subaverage general intellectual functioning"; "resulting in or associated with impairments in adaptive behavior"; "which manifested during the developmental period." O.C.G.A. § 17-7-131(a)(2) ; see also Moore v. Texas , --- U.S. ----, 137 S. Ct. 1039, 1045, 197 L.Ed.2d 416 (2017) (explaining the "generally accepted, uncontroversial intellectual-disability diagnostic definition," which Georgia's definition matches). Considering the evidence presented at trial and in the habeas proceedings, Raulerson failed to prove that it is "highly probable" that he is intellectually disabled.
Raulerson's IQ scores that he received as a child undermine that he had "significantly subaverage general intellectual functioning," which is generally defined as an IQ between 70 and 75 or below.
*1008 Ledford v. Warden, Ga. Diagnostic & Classification Prison , 818 F.3d 600, 633 (11th Cir. 2016). At trial, the evidence proved that Raulerson had received two IQ scores as a child that were above the range of intellectual disability. When Raulerson was eleven years old, he received an IQ score of 78. And when he was fourteen years old, he received an IQ score of 83. Both scores refute that Raulerson had subaverage intellectual functioning.
By applying two adjustments, the Flynn effect and the standard error of measurement, Dr. Grant testified that Raulerson's IQ scores could be as low as 70 and 74. But neither adjustment provides clear and convincing evidence of his subaverage intellectual functioning. No adjustment for the Flynn effect is required in this Circuit. Id. at 635-37. Because "IQ tests are scored on a scale that is relative to the population" when the test is developed, the Flynn effect adjusts for the empirical observation that IQ scores are rising over time. McManus v. Neal , 779 F.3d 634, 652 (7th Cir. 2015). But as we have acknowledged, there is no consensus about the Flynn effect among experts or among the courts. Ledford , 818 F.3d at 635-37 (explaining the divergent approaches to the Flynn effect taken by our sister circuits); Thomas v. Allen , 607 F.3d 749, 758 (11th Cir. 2010) ("[T]here is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning ...."). Although Dr. Grant testified that the Flynn effect should be applied to lower Raulerson's IQ scores, the two psychologists who had administered Raulerson's IQ tests disagreed and testified that they would not apply the Flynn effect to the scores.
Adjusting Raulerson's scores for the standard error of measurement puts him closer to the range of intellectual disability, but that standard is a "bi-directional concept." Ledford , 818 F.3d at 641. "The standard error of measurement accounts for a margin of error both below and above the IQ test-taker's score." Id. at 640 (emphasis added). While Dr. Grant applied a standard error of measurement of five or six points to lower Raulerson's IQ scores, the standard also raises his range of scores. For example, while a six-point standard error of measurement might mean Raulerson's score of 83 could reflect an IQ as low as 77, it could also reflect one as high as 89. With Dr. Grant's standard error of measurement, Raulerson had IQ ranges of 77-89 and 73-83, which both fall above and dip into the threshold of intellectual disability. And the standard error of measurement "does not carry with it a presumption that an individual's IQ falls to the bottom of his IQ range." Id. at 641. Even adjusting Raulerson's scores both for the Flynn effect and the standard error of measurement does not make it highly probable that he had subaverage intellectual functioning. As Dr. Lower testified in state habeas proceedings, although Raulerson's adjusted scores could put him in the intellectually disabled range, it "is a very small likelihood" because his scores are "pretty, pretty well above the range."
To be sure, Raulerson received an IQ score within the range of intellectual disability when he was tested after committing the murders. Both Dr. Grant and Dr. Lower tested him and scored him at an IQ of 69. But Dr. Lower also explained several reasons why he felt that Raulerson "was not probably motivated to do his best on [the tests]," including that "it was not to his advantage to do too well" because he stood charged of three capital offenses. In the light of two IQ scores comfortably above the range of intellectual disability that Raulerson received as a child, his later IQ score below the range does not clearly and convincingly prove he has "significantly subaverage general intellectual functioning."
*1009 Raulerson also has not established that it is highly probable he had an intellectual disability "which manifested during the developmental period." The "developmental period" refers to a disability that originated before the age of 18. Ledford , 818 F.3d at 635. Raulerson's claim of intellectual disability rests on Dr. Lower reevaluating his testimony about whether Raulerson was intellectually disabled, but Lower never changed his mind as to whether Raulerson had an intellectual disability that onset during the developmental period. At trial, when asked whether there was any "convincing demonstration" that Raulerson was diagnosed with an intellectual disability before age 18, Lower answered, "Absolutely none whatever." At the hearing before the superior court on collateral review, Lower still questioned whether Raulerson had an intellectual disability onset before age 18, stating that the evidence of onset was "not real strong." And Lower explained that there was "no way to determine" when Raulerson "sunk" into the range for intellectual disability. Considering the IQ scores that Raulerson received as a child, Lower also testified that Raulerson's scores were "pretty well above the range" for intellectual disability. Ultimately, Lower still could not conclude that Raulerson was intellectually disabled. In the light of Lower's testimony, Raulerson has not established by clear and convincing evidence that he had an intellectual disability that onset during the developmental period.
The record does not prove that Raulerson's claim of intellectual disability is "highly probable." So he has not rebutted the presumption that the state courts' contrary determination was correct, and he is not entitled to federal habeas relief based on Atkins .
IV. CONCLUSION
We AFFIRM the denial of Raulerson's petition for a writ of habeas corpus.